STATE of Missouri, Respondent,

v.

David E. DANIEL, Appellant.

No. WD 61165.

Missouri Court of Appeals,
Western District.

March 18, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 24, 2003.

Edward F. Ford, III, Kansas City, MO, for Appellant.

Evan J. Buchheim, Jefferson City, MO, for Respondent.

Before THOMAS H. NEWTON, P.J., ROBERT G. ULRICH and EDWIN H. SMITH, JJ.

THOMAS H. NEWTON, P.J.

After Mr. David E. Daniel attacked his girlfriend, the State charged him with one count of forcible rape, one count of forcible sodomy, one count of first-degree domestic assault, and one count of felonious restraint. A jury convicted Mr. Daniel of forcible rape, first-degree domestic assault, and felonious restraint, but acquitted him of forcible sodomy. On appeal, Mr. Daniel challenges only his conviction for first-degree domestic assault under section 565.072.[1] For the reasons explained below, we affirm.

## I. FACTUAL BACKGROUND

Viewed in the light most favorable to the jury's verdict, these are the facts of the case. On August 4, 2001, Mr. Daniel and his girlfriend, Angela Ottolini, went together to the Oceans of Fun theme park in Kansas City. While there, they saw two of Mr. Daniel's friends and decided to gather at Mr. Daniel's Liberty, Missouri, home for a barbecue later in the day. After the group arrived at Mr. Daniel's home, Mr. Daniel and Ms. Ottolini left their guests, went into a bedroom, and had consensual sexual intercourse. Not wishing to be rude to their guests, Ms. Ottolini told Mr. Daniel that she needed to stop and return to the living room. Ms. Ottolini returned to the living room and Mr. Daniel remained in the bedroom.

Upon Ms. Ottolini's return to the living room, the remaining guest told Ms. Ottolini that she was leaving because Mr. Daniel had touched her earlier in a manner that made her feel uncomfortable. Upset, Ms. Ottolini began looking around the house for her car keys so that she too could leave. Mr. Daniel came out of the bedroom and asked her why she was leaving. When she told him the reason, he became angry, accused her of cheating on him, and began choking and punching her. Mr. Daniel then sexually assaulted and raped her. After Mr. Daniel stopped, Ms. Ottolini escaped and ran to a neighbor's home. An ambulance transported Ms. Ottolini to the hospital, where doctors documented multiple injuries to her head, face, and extremities, the most notable of which was a jaw broken in two places.

Following Mr. Daniel's conviction, the trial court sentenced him to five-years in prison on the forcible rape count, twelve-years in prison on the domestic assault count, and four-years in prison on the felonious restraint count, each sentence to run consecutively.

[1]. Unless otherwise indicated, all statutory references are to RSMo.2000.

Mr. Daniel raises two points on appeal. In his first point, he contends that there was insufficient evidence to support a conviction for first-degree domestic assault under section 565.072 because he did not "reside" with Ms. Ottolini and because he did not have a "continuing" social relationship with her, as those terms are used in the statute.[2] In his second point, Mr. Daniel contends that there was insufficient evidence to support a conviction for first-degree domestic assault under section 565.072 because Ms. Ottolini did not suffer a "serious physical injury" in the attack.

## II. STANDARD OF REVIEW

"When reviewing a challenge to the sufficiency of the evidence we 'accept as true all evidence and its inferences in a light most favorable to the verdict, and we reject all contrary evidence and inferences.'" *State v. Washington,* 92 S.W.3d 205, 207 (Mo.App. W.D.2002) (quoting *State v. Goddard,* 34 S.W.3d 436, 438 (Mo.App. W.D. 2000)). "'We only determine whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt, not whether the verdict was against the weight of the evidence.'" *Id.* at 207–08 (quoting *Goddard,* 34 S.W.3d at 438).

## III. LEGAL ANALYSIS

### A. The State Presented Sufficient Evidence to Establish the Relationship Element of First–Degree Domestic Assault

#### 1. Overview of the First–Degree Domestic Assault Law

In 2000, the General Assembly enacted the first-degree domestic assault law, § 565.072. A person commits the crime of first-degree domestic assault if he "knowingly causes or attempts to cause serious physical injury to a family or household member or an adult who is or has been in a continuing social relationship of a romantic or intimate nature with the actor, as defined in section 455.010, RSMo." As defined in section 455.010, the terms "family" or "household member" include the following people:

> [S]pouses, former spouses, adults related by blood or marriage, *adults who are presently residing together or have resided together in the past, an adult who is or has been in a continuing social relationship of a romantic or intimate nature with the victim,* and adults who have a child in common regardless of whether they have been married or have resided together at any time.

§ 455.010(5) (emphasis added).

#### 2. The Relationship Element of the First Degree Domestic Assault Law

■ Mr. Daniel's first point addresses the relationship element of section 565.072. To establish the relationship element, the State ordinarily can satisfy its burden by proving any basis for the relationship designated in the statute. *See* § 565.072.1 (referring to these relationships using the disjunctive "or"). In this case, the State's domestic assault verdict director submitted more than one basis for the relationship: first, that Ms. Ottolini and Mr. Daniel "were adults who had resided together in the past"; and second, that they had been in a "continuing social relationship of a

2. A footnote in Mr. Daniel's brief suggests that the statute is vague and overbroad because it does not "define the criteria for determining when one has resided together [sic] or had a continuing social relationship." To the extent that this footnote raises an argu-

ment different from or additional to the arguments raised in Mr. Daniel's points relied on, he has failed to preserve the argument and we do not address it. Rule 84.04(e). We address only the sufficiency of the evidence to convict Mr. Daniel under section 565.072.

romantic or intimate nature." Patterned after MAI–CR 3d 319.72, the verdict director reads in pertinent part:

> As to Count III, if you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about August 4, 2001, in the County of Clay, State of Missouri, the defendant knowingly caused serious physical injury to Angela Ottolini by striking her with his fists, and
>
> *Second, that Angela Ottolini and defendant were adults who had resided together in the past and had been in a continuing social relationship of a romantic or intimate nature, and*
>
> Third, that defendant knew of the relationship submitted in paragraph Second, then you will find the defendant guilty under Count III of domestic assault in the first degree under this instruction.

(emphasis added).

Because the verdict director submitted more than one basis for the relationship between Mr. Daniel and Ms. Ottolini, it appropriately used the conjunction "and" to join them.[3]

The Notes on Use corresponding to this verdict director recognize that such a submission is proper:

> For domestic assault offenses, the victim and the defendant must be "family" or "household members" as defined by Section 455.010, RSMo 2000. Paragraph Second submits the basis for that rela-

tionship. *If more than one basis is submitted, they should be joined by "and."*

MAI–CR 3d, § 319.72, Notes on Use # 2 (emphasis added).

But Mr. Daniel contends that his conviction cannot stand unless the State actually presented evidence sufficient to prove both that he and Ms. Ottolini resided together and that they had been in a continuing social relationship of a romantic nature. We disagree.

By submitting more than one basis for the relationship in the conjunctive, the State sought to prove both that Mr. Daniel and Ms. Ottolini had been in a continuing social relationship and that the two of them had resided together in the past. By convicting Mr. Daniel, the jury necessarily found both of these things. But because proof of either one of these things was sufficient to satisfy the relationship element of section 565.072, we can affirm Mr. Daniel's conviction if there was sufficient evidence to support the jury's finding as to either basis for the relationship. *See State v. Neal*, 416 S.W.2d 120, 123 (Mo.1967) (where jury instruction sets forth alternative methods of committing a crime in the conjunctive and the evidence only establishes one of those methods, there is no error "'because in that case the instruction is more favorable to the defendant than the law requires.'") (quoting *State v. Reeder*, 394 S.W.2d 355, 358 (Mo.1965)).

Because we conclude that there was sufficient evidence to establish that Mr.

---

**3.** Count III of the indictment against Mr. Daniel charged that "Angela Ottolini was a family or household member or an adult who is or has been in a continuing social relationship of a romantic nature with the defendant in that Angela Ottolini has previously lived with the defendant." In his brief, Mr. Daniel observes that the indictment varies from the verdict director by using the phrase "in that" rather than the conjunction "and." He also observes that the indictment varies from the verdict director by using the word "lived" rather than the word "resided." To the extent that a variance exists between the indictment and the verdict director in this case, Mr. Daniel does not contend that the variance is material or prejudicial. Nor does he request that we review any variance for error. Accordingly, we do not reach this issue.

Daniel and Ms. Ottolini had been in a continuing social relationship, we need not address the sufficiency of the evidence to establish that they had resided together in the past.

### 3. The State Presented Sufficient Evidence to Establish that Ms. Ottolini and Mr. Daniel Had Been in a Continuing Social Relationship

■ Mr. Daniel contends that the State presented insufficient evidence that he had been in a "continuing" social relationship with Ms. Ottolini because the two of them had a relationship characterized by frequent break-ups. Mr. Daniel's argument turns upon the meaning of the word "continuing" as used in the phrase "continuing social relationship," contained in both section 455.010(5) and section 565.072.

■ When analyzing the meaning of a criminal statute, we gauge the General Assembly's intent " 'from the words used in the statute and give effect to that intent' " *State v. Goddard,* 34 S.W.3d 436, 438 (Mo.App. W.D.2000) (quoting *Mo. Comm'n on Human Rights v. Red Dragon Rest., Inc.,* 991 S.W.2d 161, 166 (Mo.App. 1999)). In so doing, we examine the language used, according that language its plain and ordinary meaning. *State v. Williams,* 24 S.W.3d 101, 115 (Mo.App. W.D.2000).

■ In particular, we "look[ ] to whether the language is plain and clear to a person of ordinary intelligence." *Goddard,* 34 S.W.3d at 438 (internal quotation marks and citation omitted). When the General Assembly has not defined a word, we "may consult other legislative or judicial meanings" attached to the word. *Id.* We also may glean a word's plain and ordinary meaning from its dictionary definition. *State v. Crews,* 968 S.W.2d 763, 765 (Mo.App. E.D.1998). Where the statutory language is unambiguous, we need not resort to statutory construction and must give effect to the statute as it is written. *Goddard,* 34 S.W.3d at 438.

■ But where the language is ambiguous or will lead to an illogical result, we look beyond the plain and ordinary meaning of the statute. *Id.* at 438. In such a case, we construe the statute strictly against the state, "keeping in mind common sense and the evident statutory purpose." *Id.* at 438–39. *See also State v. Northcutt,* 598 S.W.2d 130, 132 (Mo. banc 1980) (when interpreting statutory provision, the court must consider purpose and object of that provision). Where genuine uncertainty exists regarding the application of a statute, we consider " 'the statute's history, surrounding circumstances, and ... the problem in society to which the legislature addressed itself.' " *Condict,* 65 S.W.3d at 12 (quoting *State v. Haskins,* 950 S.W.2d 613, 616 (Mo.App. S.D.1997)).

With these guiding principles in mind, we turn to the contested language. Neither section 455.010(5) nor section 565.072 defines the word "continuing." No Missouri case has considered the definition of the word in this context. In general parlance, the word "continuing" means "1. CONTINUOUS, CONSTANT 2. Needing no renewal: LASTING, ENDURING[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 493 (3d ed.1993). *Compare* BLACK'S LAW DICTIONARY 316 (7th ed.1999) (defining "continuing" as "1. (Of an act or event) that is uninterrupted <a continuing offense>. 2. (Of status or power) that needs no renewal; enduring <continuing stockholders> <continuing jurisdiction>") *with* BLACK'S LAW DICTIONARY 321 (6th ed.1990) (defining "continuing" as "Enduring: not terminated by a single act or fact; subsisting for a definite period or intended to cover or apply to successive similar obligations or occurrences.").

After consulting these relevant definitions, and keeping in mind common sense and the evidence purpose behind section 565.072, we conclude that the State presented sufficient evidence to establish that Mr. Daniel and Ms. Ottolini "had been in a continuing social relationship of a romantic or intimate nature." Viewed in the light most favorable to the verdict, the evidence established that Mr. Daniel and Ms. Ottolini first dated each other between December 1996 and July 1997. They resumed their relationship in September 2000 and, thereafter, dated each other exclusively between September 2000 and August 2001. Although their relationship was punctuated by arguments and "on and off" break-ups during this period, the break-ups were "nothing permanent" and always led to reconciliation.

Although the couple broke up again for a short time between late July 2001 and August 4, 2001, Ms. Ottolini continued to associate with Mr. Daniel during this time, attending a birthday party for him, spending one night with him, going shopping with him, and making plans for their trip to Oceans of Fun together. Ms. Ottolini attended the birthday party because she did not want to end the relationship. She wanted to "give it one more shot" because they "had been together for five years" and she did not want to "give up." When they went to Oceans of Fun together on August 4, 2001, Ms. Ottolini considered them to be "back together."

This evidence was sufficient to establish that Mr. Daniel and Ms. Ottolini had been in a continuing social relationship under section 565.072.

We do not agree with Mr. Daniel that the word "continuing" is synonymous with the word "uninterrupted" in this context. Such a definition would work an illogical result here, one at odds with the General Assembly's manifest purpose in protecting people from domestic violence. As the State astutely argues, such a definition would have the effect of protecting people in stable, pacific relationships, but not people in volatile relationships characterized by cyclical arguments, break-ups, and reunions.

Instead, we conclude that the definition encompasses a relationship that endures despite arguments and break-ups. As the previously quoted dictionary definitions show, the word "continuing" also equates with the words "lasting" or "enduring." The relationship between Mr. Daniel and Ms. Ottolini was of such an enduring nature; despite their arguments and occasional breakups, Ms. Ottolini and Mr. Daniel always returned to one another and reconciled. Point I is denied.

**B. The State Presented Sufficient Evidence To Establish the Serious Injury Element of First–Degree Domestic Assault**

In his second point, Mr. Daniel argues that there was insufficient evidence of "protracted loss or impairment" to justify a finding that Ms. Ottolini suffered serious physical injury under section 565.072.

As used in section 565.072, the phrase "serious physical injury" means "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." § 565.002(6). Our courts have considered the question of protracted loss or impairment before and said:

"Protracted" means something short of permanent but more than of short duration. . . . There is no minimum degree of trauma that must be inflicted to satisfy the portion of the statutory definition dealing with protracted loss or impairment. Rather, the "protracted impairment" portion of the definition of "seri-

ous physical injury" is concerned with the temporal aspect of the injury. The fact that a person recovers from an injury without residual damage does not eliminate the possibility that the person suffered "serious physical injury." Whether an injury constitutes protracted impairment depends on the circumstances of each case.

*State v. Ross,* 939 S.W.2d 15, 18 (Mo.App. S.D.1997) (citations omitted).

Accordingly, impairment lasting as little as seven days may constitute "protracted" impairment. *See Id.* at 18–19 (where victims could not walk without crutches for approximately one week following assaults, evidence was sufficient to demonstrate protracted impairment). *See also State v. Pettit,* 976 S.W.2d 585, 592 (Mo.App. W.D. 1998) ("This court finds an inability to walk without severe pain for three weeks after a gunshot wound is a sufficiently protracted impairment so as to constitute serious physical injury."); *State v. Briggs,* 740 S.W.2d 399, 401 (Mo.App. E.D.1987) (evidence that victim suffered cracked rib and missed twenty days of work as a result was sufficient to establish protracted impairment for purpose of finding that victim suffered serious physical injury).

Under the circumstances present in this case, the State presented sufficient evidence where the jury could find that Ms. Ottolini suffered "protracted impairment" of function and that Mr. Daniel consequently inflicted upon her a "serious physical injury" under section 565.072. During the attack on August 4, 2001, Ms. Ottolini suffered numerous injuries to her head and face. One of these injuries occurred when Mr. Daniel broke her jaw in multiple places, causing part of the bone to pierce the soft tissue inside of her mouth. The emergency room doctor who treated Ms. Ottolini characterized this injury as a serious one. To repair this injury required that Ms. Ottolini spend five days in the hospital and have her jaw wired shut for three weeks. Ms. Ottolini said that the injury was very painful and made it difficult for her to speak. All of this evidence demonstrates protracted impairment of function comparable to *Ross, Pettit,* and *Briggs.* Point II is denied.

### IV. CONCLUSION

Because the State presented sufficient evidence to establish that Mr. Daniel and Ms. Ottolini had been in a continuing social relationship of a romantic or intimate nature, the State satisfied the relationship element of section 565.072. The State also presented sufficient evidence to establish that Ms. Ottolini suffered a serious physical injury from Mr. Daniel's attack. Accordingly, we affirm.

ROBERT G. ULRICH and EDWIN H. SMITH, JJ., concur.