STATE of Missouri, Plaintiff–
Respondent,

v.

Machelle SLAVENS, a/k/a Machelle
Kelley, a/k/a Machelle Martin,
Defendant–Appellant.

No. 26584.

Missouri Court of Appeals,
Southern District,
Division Two.

March 10, 2006.

Motion for Rehearing or Transfer
Denied April 3, 2006.

Application for Transfer Denied
May 30, 2006.

Bruce Galloway, Springfield, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Karen L. Kramer, Assistant Attorney General, Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

Machelle Slavens ("Defendant")[1] appeals the jury convictions of the class A felony of kidnapping, in violation of Section 565.110[2] and the class D felony of interference with custody, in violation of Section 565.150, challenging, *inter alia*, the application of Section 565.110 to the facts of this case, and sufficiency of the evidence as to Section 565.150. We reverse.

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial: On November 1, 2000, Defendant gave birth to T.M., a preterm baby girl in Harrison, Arkansas. T.M. was transferred, at the request of her treating physician in Arkansas, to the Cox South Hospital ("Cox") Neonatal Intensive Care Unit ("NICU"), in Springfield, Missouri, on November 2, 2000, suffering from respiratory distress, respiratory failure, and possible infection as a result of her premature birth. She was admitted to the NICU and treated by Dr. Colleen Rose ("Dr.Rose"), a neonatal specialist.

Brandy Goddard ("Goddard"), a deputy juvenile officer with the Greene County Juvenile Office, was notified of the birth of T.M., and that T.M. was a patient in the NICU receiving medical care. At 9:00 a.m. on November 8, 2000, based on her authority under Rule 111.12,[3] Goddard decided to take T.M. into protective custody.

Goddard contacted Denise Salter ("Salter"), a social worker with the NICU at Cox and informed her that T.M. had been placed in the temporary legal custody of the Missouri Division of Family Services ("DFS") and that she was not to be discharged to her parents. Goddard filled out the necessary paper work, and faxed the form to Cox to be placed in T.M.'s hospital records. At approximately 3:30 p.m. that same day, Goddard spoke to Defendant on the phone at which time Goddard informed her that she was taking custody of T.M. Following this conversation, Goddard filed a petition and affidavit setting forth her rationale for placing T.M. in protective custody. The circuit court of Greene County issued an order granting Goddard's petition at 4:15 p.m. on Novem-

---

1. Defendant is also known as Machelle Kelley and Machelle Martin.

2. All references to statutes are to RSMo (2000) unless otherwise indicated.

3. Rule 111.12(b), Missouri Juvenile Court Rules (2000), states in pertinent part:

   A juvenile may be taken into temporary protective custody by a juvenile officer if there is reasonable cause to believe that the juvenile is without proper care, custody or support and that temporary protective custody is nec-essary to prevent personal harm to the juvenile.
   . . . .
   (d) Temporary protective custody of a juvenile for a period not to exceed twenty-four hours may be authorized by the juvenile officer. A juvenile who has been taken into temporary protective custody by the juvenile officer shall not be held for a period of more than twenty-four hours unless the court has authorized extended temporary protective custody or protective custody pursuant to Rule 111.13.

ber 8, 2000, which effectively placed T.M. in the legal custody of DFS.

Between 1:30 a.m. and 2:00 a.m. on November 9, 2000, Defendant, with the aid of her mother, Pam Slavens ("Pam") and her husband John Martin ("Martin"), removed T.M. from NICU and hurriedly left the hospital after being noticed by several hospital employees. Approximately five and one-half hours later authorities were able to trace a call made from Defendant at a truck stop in Oklahoma to her grandmother. Oklahoma Highway Patrolman John Looper was dispatched to the truck stop and upon his arrival he found Defendant, T.M. and Martin in the lounge, and he arrested Defendant.

Defendant was charged, as a prior and persistent offender, in an amended felony information with the class A felony of kidnapping ("Count I"), the class D felony of interference with custody ("Count III"), and the class D felony of endangering the welfare of a child in the first degree ("Count V").[4]

The case was tried before a jury, and on July 29, 2004, the jury returned a verdict of guilty on the above mentioned counts of kidnapping, interference with custody and endangering the welfare of a child in the first degree. Defendant was sentenced to seventeen years on Count I, five years on Count III, and ten years on Count V, with the sentences to run concurrently. Defendant appeals her convictions as to Counts I and III only.

Defendant raises eight points in this appeal, however, as we find Points I and V dispositive, we need not address the remaining issues. In Point I, Defendant argues that the facts of this case are not

punishable as kidnapping under Section 565.110.1(3). In Point V, Defendant argues that there was not sufficient evidence to support the finding that she knew that she had no legal right to remove T.M. from the custody of DFS in violation of Section 565.150. We agree as to both points.

■ In Point I, Defendant contends that the trial court erred in overruling her motions for judgments of acquittal at the close of the State's evidence and at the close of all the evidence, in that the State failed to establish the elements of kidnapping under Section 565.110.1(3). Section 565.110 provides in pertinent part:

> A person commits the crime of kidnapping if he or she unlawfully removes another without his or her consent from the place where he or she is found or unlawfully confines another without his or her consent for a substantial period, for the purpose of
>
> . . . .
>
> (3) Interfering with the performance of any governmental or political function[.]

Appellant argues, and we are constrained to agree, that applying this kidnapping provision to a situation in which a mother allegedly removed her child to prevent DFS, or another state agency, from taking custody, is contrary to the intentions of the General Assembly.[5]

■ In applying a criminal statute "our primary role is to ascertain the intent of the legislature from the language used in the statute and, if possible, give effect to that intent." *Spier v. State*, 174 S.W.3d 539, 542 (Mo.App. E.D.2005). The statute does not define what constitutes a governmental function. When an uncertainty about a statute's application exists "we

---

4. Defendant was also charged with the class B felony of kidnapping and the class C felony of felonious restraint however, she was acquitted of both counts.

5. The verdict directing instruction on Count I required a finding that Defendant interfered with a governmental function by preventing DFS from taking custody of T.M.

consider 'the statute's history, surrounding circumstances, and ... the problem in society to which the legislature addressed itself.'" *State v. Daniel,* 103 S.W.3d 822, 826 (Mo.App. W.D.2003) (quoting *State v. Condict,* 65 S.W.3d 6, 12 (Mo.App. S.D. 2001)).

Defendant directs our attention to *Spier,* in which the eastern district of this court had occasion to construe the provision of the kidnapping statute now before us. There, the court held, on strikingly similar facts, that a parent who has removed a child from the custody of a state agency could not, in light of the statutory history, be considered interfering with a governmental function under Section 565.110.1(3). *Spier,* 174 S.W.3d at 542.

■ The applicable portion of this statute, subsection 3, is drawn, nearly verbatim from Section 212.1(d) of the Model Penal Code.[6] *Spier,* 174 S.W.3d at 541. As such, the comments to the Model Penal Code provide guidance in gleaning the legislative intent behind Section 565.110. It has been well established that when the legislature adopts a model act, we must presume that the "General Assembly intended to adopt the interpretation of that section contained in the applicable comments" to the model act, in this instance, the Model Penal Code. *Id* at 542; *State v. Anderson,* 515 S.W.2d 534, 539 (Mo. banc 1974); *State v. Welty,* 729 S.W.2d 594, 596 (Mo.App. S.D.1987); *John Deere Co. v. Jeff DeWitt Auction Co., Inc.,* 690 S.W.2d 511, 514 (Mo.App. S.D.1985).

In *Spier,* the court pointed to the comments following Section 212.1(d) to illustrate the legislature's intentions:

... paragraph (d) adds a provision against kidnapping 'to interfere with the performance of a governmental or political function.' This specification reaches political terrorism and the like, and classifies such conduct as among the most serious kinds of unlawful confinement.

*Id.* at 541. (quoting A.L.I., Model Penal Code and Commentaries, Part II, Section 212.1, comment 4, p. 228 (1980)). The comments further stated:

The list of purposes in Section 212.1 thus would exclude from kidnapping cases where a parent out of affection takes his child away from another parent or lawful custodian....

*Id.* at 542. (quoting A.L.I., Model Penal Code and Commentaries, Part II, Section 212.1, comment 4, p. 228 (1980)). We also find guidance in the commentary describing the relationship between the Model Penal Code's kidnapping provision and the Model Penal Code's provision regarding interference with custody, which states in pertinent part:

Interference with custody and kidnapping address quite distinct concerns. Kidnapping protects against physical danger, extortion, and terrorization by abduction. Section 212.4 [interference with custody], on the other hand, is designed to maintain both the parental custody of children and the institutional authority over committed person against all unlawful interference.... *Interference with custody is further distinguished from kidnapping by the likelihood that the actor will be a parent* or other person favorably disposed toward

---

**6.** Section 212.1 of the Model Penal Code provides:

A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found,

or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:

....

(d) to interfere with the performance of any governmental or political function.

the child or committed person, thus justifying a different penalty structure and the consideration of special defenses.

A.L.I., Model Penal Code and Commentaries, Part II, Section 212.4, comment 4, p. 252 (1980) (emphasis added).

Furthermore, we find it telling that the General Assembly has enacted several other statutes relevant to Defendant's alleged conduct in this case. Most notably Section 565.153, entitled *Parental kidnapping* which states:

In the absence of a court order determining rights of custody or visitation to a child, a person having a right of custody of the child commits the crime of *parental kidnapping* if he removes, takes, detains, conceals, or entices away that child within or without the state, without good cause, and with the intent to deprive the custody right of another person or a *public agency* also having a custody right to that child.[7] (emphasis added).

Likewise Section 211.421 criminalizes "Interfering with orders of court or endangering the welfare of child" for anyone that "knowingly or negligently disobeys, violates or interferes with a lawful order of the court with relation to the child...." Section 565.150, with which Defendant was charged, also criminalizes interference with custody if "knowing that he has no legal right to do so, he takes or entices from legal custody any person entrusted by order of a court to the custody of another person or institution."[8] These statutes are further evidence that the legislature did not intend kidnapping, by way of interfering with a governmental or polit-

ical function, to include parents removing their children from the custody of another.

Based upon the principles outlined above, we concur with the eastern district's construction of Section 565.110.1(3). The Model Penal Code and Missouri's statutory scheme clearly illustrate that a parent taking their own child from a government agency is not considered "interfering with the performance of any government or political function" under Section 565.110.1(3). Accordingly, Defendant cannot be said to have interfered with the performance of any governmental or political function by removing her child. As such, the trial court erred in overruling Defendant's motion for acquittal at the close of the evidence, and the Defendant's conviction pursuant to Section 565.110.1(3) must be reversed.

■ In Point V, Defendant argues that the trial court erred in denying her motion for judgment of acquittal on the charge of interference with custody in that the State failed to prove that she knew that she was removing T.M. from the custody of DFS, and that she was aware that she had no legal right to do so.

In reviewing a jury verdict for sufficiency of the evidence, "we accept as true all of the evidence favorable to the State, including all reasonable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary." *State v. Shockley,* 98 S.W.3d 885, 890 (Mo.App. S.D.2003). This review is limited to determining whether sufficient evidence existed from which "a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.*

---

**7.** While there was a court order in this case, there was no evidence as noted below, that Defendant had knowledge of it.

**8.** Defendant makes no argument on this appeal that she was convicted of two separate offenses for the same act in violation of Section 556.041.

Interference with custody is criminalized by Section 565.150, which provides in pertinent part:

A person commits the crime of interference with custody if, knowing that he has no legal right to do so, he takes or entices from legal custody any person entrusted by order of a court to the custody of another person or institution.

The verdict directing instruction given in this case pertaining to the charge of interference with custody read as follows:

As to Count III [interference with custody Section 565.150], if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about the 9th day of November, 2000, in the County of Greene, State of Missouri, [D]efendant took T.M. from the custody of the [DFS], and

Second, that T.M. had been entrusted by order of a Court to the custody of [DFS], and

*Third, that [D]efendant knew she had no legal right to so take T.M. from the custody of [DFS]*, and [9]

Fourth, that [D]efendant removed T.M. from this state, then you will find [D]efendant guilty under Count III of interference of custody. (emphasis added).

A plain reading of both the instruction and Section 565.150 reveals that the State must show that Defendant knew she was taking T.M. from the custody of DFS, and was aware that she had no legal right to do so in order to support a conviction for interfering with custody. As is discussed below there was not sufficient evidence

presented at trial that Defendant knew that DFS had custody of T.M.

The State maintains that Goddard's conversations with Defendant were sufficient evidence of Defendant's knowledge. However, the record clearly illustrates that Goddard simply told Defendant that *she* was taking custody of T.M. Goddard never told Defendant that DFS was taking, or had been ordered to take, custody. Nor was there any evidence in the record that Defendant believed Goddard was acting on behalf of DFS.[10]

■ The State also argues that Defendant's actions (removing T.M. from the hospital in early morning hours, and running away from hospital workers) was sufficient evidence that she was aware that she had no legal right to remove T.M. While this evidence tends to show that Defendant knew that taking T.M. was opposed by the hospital, it does not tend to prove that Defendant knew that DFS actually had custody of T.M.

The State also points to the following testimony by Martin at trial to illustrate that Defendant knew DFS had custody of T.M.:

Q. And [Defendant] wanted to take [T.M.] from the hospital so DFS couldn't take custody; isn't that right?

A. I assume so.

. . . .

Q. Well do you remember answering that you had gone so that you could take—so that DFS couldn't take custody of [T.M.].

9. This instruction complies with MAI–CR 319.30. We note that while Section 565.150 states that a person who "takes ... from *legal* custody any person," is guilty of interference with custody, paragraph three of the corresponding approved instruction does not dis-

tinguish between legal and physical custody. (emphasis added).

10. At oral argument, counsel for the State admitted that there was no evidence in the record that Defendant was ever told that DFS had custody of T.M.

A. No, I don't recall that either.

Then, the prosecutor attempted to impeach Martin with a prior statement during this exchange:

Q. Do you remember Detective Everett asking you [if the reason T.M. was taken from the hospital was to prevent DFS from taking custody]?

A. No. I mean, that's been over two years ago.

. . . .

Q. Now [Defendant] had told you that if you took [T.M.] from the hospital, then DFS and juvenile couldn't take custody, isn't that correct?

A. I'm sure somewhere along the line, she did, yeah.

Q. And that's why you wanted to get out of the hospital so quickly after you took [T.M.], so no one could tell you that DFS had taken custody; isn't that correct?

A. I have no idea. I mean, that's . . . If something like that's going on, you don't stick around to find out what's going to happen.

This is not evidence from which a reasonable juror could conclude that Defendant knew that DFS had actually taken custody of T.M. The testimony reproduced above was elicited during cross-examination of Martin in which he never affirmatively states that Defendant knew that DFS was in custody of T.M. At best it tends to show that T.M. was aware that DFS might, was trying to, or was in the process of taking custody of T.M. Throughout the exchange the State characterized Defendant and Martin's actions as "preventing" DFS from taking custody; or removing T.M. from the hospital so "DFS couldn't take" custody. However, the statute under which she was charged and the corresponding verdict directing instruction both require a finding that Defendant took the child from the custody of another, not that Defendant prevented another from taking custody of a child. *See* Section 565.150; MAI–CR 319.30.

Our review of the entire record reveals that the evidence relied upon by the State is insufficient to show that Defendant knew that DFS actually had custody of T.M. when she removed her from the hospital. Accordingly, Point V is granted and Defendant's conviction as to Count III, interference with custody, must be reversed.

The Defendant's convictions as to Counts I and III are reversed.

SHRUM, P.J., and BARNEY, J., concur.