IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. FRITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

BENJERMIN J. FRITH, APPELLANT.

Filed April 14, 2020.    No. A-19-551.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Carolyn Wilson, Assistant Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Benjermin J. Frith appeals his jury conviction of first degree domestic assault. Frith alleges that the evidence presented at trial was insufficient to support his conviction and that the district court erred in allowing hearsay testimony and overruling his motion for a new trial. For the reasons that follow, we affirm.

## BACKGROUND

On November 2, 2018, the State filed an information against Frith alleging that on or about September 26, 2018, Frith committed first degree domestic assault in violation of Neb. Rev. Stat. § 28-323(3) (Reissue 2016), which makes it a crime to "intentionally and knowingly cause serious bodily injury to [one's] intimate partner." First degree domestic assault is a Class IIA felony, punishable by up to 20 years' imprisonment, with no minimum sentence. § 28-323(7); Neb. Rev.

- 1 -

Stat. § 28-105(1) (Cum. Supp. 2018). A jury trial on the State's information was held on March 5 and 6, 2019.

At trial, Shelby Seago, the alleged victim, testified that at the time of the events of this case, she and Frith were involved in an intimate, dating relationship. While she was at work the evening of September 26, 2018, Seago received a phone call from Frith. Seago testified that Frith "wasn't really making any sense" and appeared to be "drunk" when he told her that "he was having a girl come over" to the apartment they shared. Frith continued to "talk gibberish" until it appeared to Seago that he had fallen asleep, and she ended the call.

Seago testified that after the phone call, she was "pissed" that Frith was apparently going to have another woman over to the apartment. After she got off work, at approximately 8 o'clock that evening, Seago returned to the apartment and noticed that it did not appear that anyone other than Frith had been there. However, Seago did find a partially empty bottle of "Jäger" in the apartment's second bedroom. She testified that the bottle was "big" and she had never seen it before that night.

Seago then went into the master bedroom where she found Frith laying on the bed "sprawled out like a starfish face down" and snoring. She then picked up Frith's cell phone from the side table, entered the passcode Frith had previously given her, and found messages from Frith "telling girls that [Frith] had his own place and a car and he could come pick them up and take them back to the apartment. Or he could meet them, and he had drugs and alcohol that he could, you know, give to them, too, if they wanted that." Seago testified that she became upset and woke Frith up and told him to "get out." She testified that she previously had told Frith that if he did not remain sober, he would not be allowed to continue to live with her. Frith then "continued to lay on the bed and flipped [Seago] off and called [her] names" like "bitch" and told her to "fuck off."

Seago testified that she went into the other bedroom, where Frith kept his belongings, and began to pack them into a bin. She testified that soon after, she was "bear tackled" and Frith picked her up and threw her down on the ground in the hallway. Seago attempted to back herself into a corner so Frith would be unable to grab her, but he grabbed her from her side, picked her up, and carried her into the bedroom doorway. She attempted to resist, but Frith was able to pick Seago up and "tossed" her. Seago testified that she landed directly on her left elbow. Seago testified that the pain was a "12 out of 10" and that she was "pretty sure [her elbow] broke."

According to Seago, Frith then began to slam all the doors in the apartment, and then made his way back to her and slapped her in the face and kicked her on her right hip while she remained on the floor. Frith then dragged Seago by her arm into the living room. Seago testified that she was "terrified" and unsure what was going to happen to her. Frith then lay down on the couch, told Seago he needed "alone time," and Seago told him to leave the apartment. Frith responded that if Seago wanted him to leave she had to "call the cops."

Seago testified that while she was still screaming at Frith, he got on top of her and held her down with his hands and knees. Frith covered Seago's mouth with his hand, trying to keep her quiet. Frith soon became apologetic telling Seago "baby, I'm sorry" and "I didn't mean it." Seago then bit Frith's hand and told him to get off of her. Frith then went outside to smoke.

Seago testified that she then called her mother and told her to come pick her up. Seago remained on the phone with her mother when Frith came back inside and she screamed at him to

stay away from her. Seago's mother then called the police and she relayed the questions the police were asking to Seago. Seago told her mother that she thought her arm was broken because she was in pain and could barely move it. Seago remained on the phone until the police arrived.

After the police arrived, Seago was examined by emergency medical technicians and was taken by ambulance to a hospital. Over objection by Frith's attorney, Seago testified that a doctor at the hospital informed her that she had fractured her arm. Seago testified that she is left-hand dominant.

Seago testified that she received x rays on her arm to determine what further treatment was needed. The doctor at "OrthWest" determined that Seago did not require a cast, but would need a splint and sling that she could use "as needed." Seago testified that she has experienced ongoing problems with her arm, including "pain all day every day" where her fracture was. She has also experienced issues with her use of her arm, including "shooting pain" that has caused her to drop objects, disrupts her work, or will wake her up throughout the night. Seago testified that her doctors informed her that she has a pinched ulnar nerve, likely as a result of the fracture.

On cross-examination, Seago testified that when she came home from work on the evening of September 26, 2018, she became upset because she believed Frith had been drinking and cheating on her. She acknowledged that she woke Frith up by yelling at him and that she poured the remainder of the bottle of Jäger into the sink.

Seago testified that Frith had willingly given her the passcode to his phone and she occasionally looked at the content of his phone. She testified that she discovered messages from Frith to other women on Tinder, Facebook, and Instagram that made her angry to the point she wanted Frith to leave the apartment. Seago denied that Frith answered the door when police arrived and that he told her to tell the truth. She also denied answering questions from the police in the apartment living room.

Seago testified that her followup appointment regarding her arm was with an orthopedist. She acknowledged that the medical staff did not order or discuss any need for physical therapy. They also told Seago that she did not require surgery "because the fracture wasn't bad enough." Seago was given a sling at the first followup appointment, and returned to the orthopedist for three other visits.

On redirect examination, the State introduced exhibits 2 through 7, photographs that were taken at the hospital on September 26, 2018, and purport to show injuries Seago sustained on that evening. Exhibit 3 shows scratch marks on one of Seago's shoulders. Exhibits 6 and 7 show Seago's left arm wrapped in a splint and Ace bandage, and in a sling.

Seago testified that she was asked to give a written statement while she was at the hospital, but was unable to do so because the injuries she sustained were to her dominant arm and she was unable to write. She testified that, as a result of the fracture, she had to do everything with her right hand for 6 weeks. She testified that she continued to have ongoing issues related to the fracture up until the date of trial.

Jennifer McCabe, Seago's mother, testified that she received a phone call from Seago on the evening of September 26, 2018. McCabe testified that Seago was "crying hysterically" and Seago told her that Frith had thrown and pushed her down. Seago also informed McCabe that her

arm was numb and she believed that it was broken. McCabe testified that she believed Seago called somewhere between 7:30 p.m. and 8:30 p.m. that evening.

McCabe testified that Seago told her that she and Frith had gotten into an argument and Frith pushed her and held her down on the floor, but she was able to get away and lock herself in the bedroom. McCabe testified that, at that point, she called 911 on a separate phone and drove over to Seago's apartment while she remained on the line with both Seago and the 911 dispatcher. McCabe testified that she relayed the information that Seago had given her to the 911 dispatcher.

By the time McCabe arrived at Seago's apartment, the police and an ambulance had already arrived. McCabe waited 10-15 minutes in her car while the police talked to Seago. Seago was taken to the hospital in the ambulance, which McCabe followed there. Once McCabe arrived at the hospital, she was informed by hospital staff that Seago had been taken to an exam room and that they would come get her when she was able to see Seago.

After approximately five minutes, McCabe was taken back to the exam room where Seago was located. McCabe testified that Seago had been crying and was holding her arm. She testified that Seago's arm was originally wrapped in "half a cast" and a sling, but the cast was replaced the next day for one less "bulky." Seago remained in the second cast for 1½ to 2 weeks. Medical staff indicated the cast could be worn or taken off "as comfortable" for Seago, but she was required to wear the sling.

McCabe testified that she stayed with Seago at her apartment for the next 5 days after the incident. She testified that Seago was unable to get out of bed or shower on her own, and also had difficulty going to the bathroom alone. Seago works as a hairstylist and was unable to work until mid-November, approximately a month and a half, due to her followup visits with the orthopedic doctor. McCabe testified that Seago has voiced complaints about ongoing issues with her left arm and that Seago has "some kind of nerve damage or pinch" that she had not previously dealt with. McCabe testified that while Seago uses her right hand to hold scissors, she requires both hands to cut hair.

Dr. Richard Alarid, an emergency physician with CHI Midlands, testified that he has been a licensed physician in the state of Nebraska since 1980. Alarid testified that he worked the evening shift, from 7 p.m. to 7 a.m. on September 26, 2018.

Alarid testified that he has extensive experience with examining and treating broken bones, as well as identifying fractures. He testified that he treated Seago on September 26, 2018, at approximately 9:30 p.m. He described her condition as "a fracture of the radius of the left elbow and contusion of the right hip." Alarid testified that he personally examined the x rays of Seago's left elbow and observed swelling of the joint and "a minor fracture" of the "radial head." Alarid referred Seago to orthopedics, and did not treat Seago beyond that evening.

Alarid testified that the type of injury Seago sustained can potentially lead to "traumatic arthritis" and "joint tightness." However, he testified that, based on the x rays, Seago had not suffered a significant injury and her elbow "would heal without any adverse effect." However, there was nevertheless the possibility of continued pain and arthritic issues. Alarid would not anticipate any nerve issues based on his examination of Seago's injury, but testified such determination could be made in followup treatment of the injury.

On cross-examination, Alarid testified that Michelle Peterson Jones, a radiologist with Midlands, reviewed his reading of Seago's x rays the next day. Alarid testified that the most common cause of a radial head fracture is when someone puts their arm out straight to break their fall. He admitted that a doctor examining this type of injury would not be able to determine whether the individual tripped or whether they were pushed down. Alarid testified that radial head fractures usually heal within a 6- to 8-week period.

Deputy Earl Johnson, with the Sarpy County sheriff's office, testified that he has worked with the sheriff's office since 2001 and is assigned to the road patrol division. Within that division, Johnson patrols an assigned area, responds to dispatch calls, and performs traffic stops.

Johnson testified that he worked the evening shift on September 26, 2018, when he responded to a dispatch call regarding an altercation between Seago and Frith. When he arrived at Seago's apartment, Johnson made contact with Seago and observed her to be crying and holding her left arm. While Johnson was speaking with Seago, Frith "started yelling something from the patio or deck of the apartment, and he said something about telling her to tell the truth."

After speaking with Seago, Johnson asked Frith to explain to him what had happened, but Frith initially refused. At that point, Frith was placed in handcuffs and sat down on the couch. Johnson read Frith *Miranda* warnings and asked Frith if he was willing to speak with him. Frith told Johnson that Seago had been "flipping out" and that the two of them had an argument over text messages she found on his cellphone. According to Johnson, Frith indicated that he grabbed Seago and threw her onto the bed. Johnson testified that this was not the same description of events given by Seago. At that point, Johnson arrested Frith for assault. Johnson testified that Seago had informed him that she hurt her arm when she was thrown to the ground by Frith, and he later found out that she had broken her arm.

On cross-examination, Johnson acknowledged that his incident report indicated that Frith had told him that Seago was "acting crazy" and that he had to hold her down on the bed because she was "flipping out." He further acknowledged that it was possible he was mistaken when he testified that Frith had told him that he "threw" Seago on the bed.

After Johnson's testimony, the State rested its presentation of evidence. At that point, Frith's trial counsel moved to dismiss on the grounds that the State had failed to produce sufficient evidence to find Frith guilty of first degree domestic assault. The district court denied the motion to dismiss.

Frith took the witness stand to testify in his own behalf. Frith testified that he and Seago met on "Tinder" and were in a relationship for over a year. He testified that, despite Seago's testimony that it was "her apartment," the two "split everything 50/50." He acknowledged that Seago's name was the only one on the lease due to his credit and criminal history. Frith testified that he has a previous conviction for burglary from 7 years earlier when he was around 20 years old. He testified that the decision was "immature" and he has matured since then.

Frith testified that at some point during his relationship with Seago the two agreed "that [he and Seago] would see other people in a sexual nature as long as [they] used protection and were honest and [they] didn't bring anybody back to [their] living quarters." Frith denied having a problem with alcohol, but admitted that he and Seago had discussed "maybe not going out every

weekend" because of Seago's work schedule. He denied Seago ever told him that if he drank again he would have to move out of the apartment.

Frith testified that on September 26, 2018, he worked from 6 a.m. until 1 p.m. After his shift, Frith went to a gas station and purchased a pack of cigarettes and a bottle of "Jägermeister." Frith testified that he went to the apartment he shared with Seago, played video games for an hour, had two drinks, and went to sleep. Frith denied having called Seago that day.

Frith testified that he woke up at approximately 8:30 p.m. to the sound of Seago yelling at him. He recalls her, standing in the doorway with his phone, accusing him of having "bitches on Tinder" and drinking. Frith testified that Seago was "hostile" and "out of control." Frith denied having ever given Seago the passcode to his phone. He speculated that Seago got his passcode from watching him enter it.

After Seago began yelling at Frith to "get out" of the apartment, he got out of bed, put on his shoes, and started walking to leave. He testified that Seago was in the kitchen pouring the bottle of Jägermeister into the sink and he was at the door when Seago grabbed him and "started hitting [him] repeatedly in the torso." Frith testified that he grabbed Seago in response, put his arms around her, and told her to "relax." He testified that Seago "jerked away," lost her balance, and fell backwards. Frith testified that he tried to help Seago up and asked if she was okay, but she continued crying.

Frith testified that Seago eventually got up off the floor and went back to the bedroom to make a phone call. He waited awhile, went back to the bedroom to check in on Seago, but she yelled at him and told him to get away from her. Frith then went outside to the patio and was smoking a cigarette when the police arrived. Frith acknowledged he probably told Seago to "tell the truth." He testified that he did not leave after Seago fell because he was concerned about her safety.

Frith denied slapping Seago in the face or kicking her in the hip. Frith acknowledged that he had been drinking, but insisted his alcohol consumption did not impact his ability to recall the events of that night.

On cross-examination, Frith acknowledged it was possible that he did not recall calling Seago because he had been consuming alcohol. He could not explain why Seago was so angry that he had been talking to other women despite their "open relationship."

Frith denied telling the police that he held Seago down on the bed and accused the sheriff's deputies of "putting words in [his] mouth." Frith further denied ever giving a statement to police and only "gave them a general like why [Seago] was upset." He denied giving any details about the events of that night.

After Frith's testimony, the defense rested. Frith's trial counsel renewed the previous motion to dismiss based on the insufficiency of the evidence, which again was overruled. Both the State and the defense presented closing arguments. After deliberations, the jury found Frith guilty of first degree domestic assault. Because the jury found Frith guilty of the principal charge of first degree domestic assault, it did not return a verdict on the lesser-included offense of third degree domestic assault. A presentence investigation was ordered by the district court.

Trial counsel for Frith filed a motion for new trial on March 13, 2019, and an amended motion for new trial on March 22. The amended motion alleged that the verdict was not supported

by sufficient evidence as to the element of serious bodily injury and that the district court committed an error of law by allowing hearsay testimony over Frith's objection. That motion was argued on March 25, and was taken under advisement. On April 3, the district court denied Frith's amended motion for new trial via written order. On May 20, Frith was sentenced to 5 to 10 years' imprisonment with credit for 56 days' time served. This appeal followed.

## ASSIGNMENTS OF ERROR

Frith assigns, restated, that (1) the evidence presented at trial was insufficient to support a finding of "serious bodily injury," a necessary element to the charge of first degree domestic assault; (2) the district court erroneously admitted hearsay testimony over Frith's objections; and (3) the district court erred in overruling Frith's motion for a new trial.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019).

The standard of review for the denial of a motion for new trial is whether the trial court abused its discretion in denying the motion. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Stubbendieck, supra*.

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

Frith first contends that the State failed to adduce sufficient evidence to support his conviction of first degree domestic assault under § 28-323(3). Section 28-323(3) provides: "A person commits the offense of domestic assault in the first degree if he or she intentionally and knowingly causes serious bodily injury to his or her intimate partner." Notably, the jury was also instructed on the lesser-included offense of third degree domestic assault. Section 28-323(1) provides:

A person commits the offense of domestic assault in the third degree if he or she:

(a) Intentionally and knowingly causes bodily injury to his or her intimate partner;

(b) Threatens an intimate partner with imminent bodily injury; or

(c) Threatens an intimate partner in a menacing manner.

Frith argues that the State failed to establish that Seago sustained a "serious bodily injury." Under Neb. Rev. Stat. § 28-109(21) (Reissue 2016), a serious bodily injury is defined as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body[.]" Under § 28-109(4), "bodily injury" is defined as "physical pain, illness, or any impairment of physical condition[.]" Because the jury was instructed on both the definition of "serious bodily injury" and "bodily injury," it is clear to us that it had the opportunity to consider both definitions in light of the evidence, and determined that Frith had caused a *serious* bodily injury as it is defined by § 28-109(21).

In arguing that there was insufficient evidence that Seago suffered a serious bodily injury, Frith relies extensively on Alarid's testimony that Seago's injury "was not a significant injury" and "would heal without any adverse effect." Frith urges us to adopt the position that "where there is medical testimony given which is contrary to that of a lay witness, that medical testimony should be taken into account by the trier of fact or given more weight." Brief for appellant at 12. However, we decline to do so. The Nebraska Supreme Court has long held that "[i]n personal injury cases where the injuries are objective and the conclusion to be drawn from proved basic facts does not require special technical knowledge or science, the use of expert testimony is not legally necessary." *State v. Thomas*, 210 Neb. 298, 300-01, 314 N.W.2d 15, 18 (1981) (quoting *Eiting v. Godding*, 191 Neb. 88, 91, 214 N.W.2d 241, 243 (1974)). What constitutes a "serious bodily injury" is a determination that can be made from "the evidence presented and the common knowledge and usual experience of the trier of fact." *State v. Thomas*, 210 Neb. at 301, 314 N.W.2d at 18.

Frith's argument that Alarid's testimony conflicted with that of Seago and her mother, McCabe, and should be afforded more weight on the issue of serious bodily injury as expert medical testimony, is nothing more than an argument related to credibility of the witnesses and weight of the evidence. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

It is clear from the record that the State relied on the portion of § 28-109(1) defining serious bodily injury as involving a "protracted loss or impairment of the function of any part or organ of the body." While Frith is correct that the Nebraska appellate courts have never defined "protracted loss or impairment," other courts have. Missouri defines protracted as "something short of permanent but more than of short duration." *State v. Raines*, 118 S.W.3d 205, 210 (Mo. App. 2003). Indiana defines "protracted" as "to draw out or lengthen in time." *Mann v. State*, 895 N.E.2d 119, 122 (Ind. App. 2008). Applying the statutory term in the context of the charge of aggravated assault, Wyoming requires that "the State must prove the victim suffered a long or lengthy impairment of a bodily function." *Thompson v. State*, 408 P.3d 756, 766 (Wyo. 2018). In all of

these cases, the term "protracted" deals with the temporal aspect of the injury. See *State v. Daniel*, 103 S.W.3d 822 (Mo. App. 2003).

In this case, while Alarid testified that Seago's injury "would heal without any adverse effect," he also testified that radial head fractures may lead to "traumatic arthritis" and "joint tightness." Furthermore, both Seago and her mother testified to the ongoing effects of the injury. Seago testified that she still experienced pain "all day every day." While Seago did not require surgery for the fracture, she was unable to return to work for approximately 6 weeks at the direction of her orthopedist, and experienced issues performing other daily tasks such as getting out of bed, showering, and going to the bathroom. Alarid himself testified that his involvement with Seago's treatment was limited to the initial diagnosis and x-ray examination. He did not conduct any follow-up with Seago since the date she was first examined at the hospital. After viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that Seago suffered a "serious bodily injury" as defined under § 28-109(21). Accordingly, this argument fails.

HEARSAY TESTIMONY

Frith next argues that the district court erred in allowing certain hearsay testimony from Seago and McCabe over his objection. Specifically, Frith takes issue with statements of lay witnesses he claims amount to impermissible opinion testimony related to Seago's medical diagnosis and treatment. The Nebraska Evidence Rules, specifically Neb. Rev. Stat. § 27-701 (Reissue 2016), provide:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to clear understanding of his testimony or the determination of a fact in issue.

However, the State argues, and we agree, that Frith has waived this argument. The opponent to the evidence must identify which statements are objectionable as inadmissible hearsay. *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal. *Id*.

On appeal, Frith cites to the record claiming that certain testimony by Seago and McCabe related to Seago's ongoing medical treatment was impermissible hearsay. However, from reviewing the record, none of the statements Frith now takes issue with on appeal were objected to at trial. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017). While the record does show Frith's trial counsel objected to certain testimony on hearsay grounds, this testimony does not consist of the same statements Frith now takes issue with on appeal. Neither the trial court nor the appellate court are obliged to sort the alleged hearsay statements out on the opponent's behalf. *State v. Henry, supra*. Because this argument has not been properly preserved, we do not address its merits, and it fails.

MOTION FOR NEW TRIAL

Frith's final assignment of error is that the district court abused its discretion by denying his motion for new trial. Under Neb. Rev. Stat. § 29-2101(4) (Reissue (2016), a new trial may be granted when "the verdict is not sustained by sufficient evidence or is contrary to law[.]" In his brief, Frith makes no argument to support his contention that the district court abused its discretion in denying his motion for new trial other than the arguments that have been previously addressed in his first two assignments of error. Because we have already concluded that Frith's arguments related to the sufficiency of evidence and the admission of hearsay testimony fail, this assignment of error also fails.

CONCLUSION

After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all elements of first degree domestic assault were satisfied beyond a reasonable doubt. Furthermore, Frith failed to preserve his assignment of error related to inadmissible hearsay testimony. Accordingly, the district court did not abuse its discretion in denying Frith's motion for new trial. For the foregoing reasons, we affirm Frith's conviction.

AFFIRMED.