

# In the Missouri Court of Appeals
## Eastern District
### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED109444 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Honorable Daniel G. Pelikan |
| OGERTA HELENA HARTWEIN, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 31, 2022 |

### Introduction

Ogerta Helena Hartwein ("Hartwein") appeals from the trial court's judgment following her convictions on one felony count ("Count I") and one misdemeanor count ("Count II") of interference with custody involving her son, A.H. Hartwein raises three points on appeal. Points One and Two challenge the sufficiency of the evidence to sustain her convictions. Point Three claims the trial court erred in admitting A.H.'s hearsay testimony.

Because the State adduced sufficient evidence that Hartwein knew she did not have legal custody of A.H. when she retained custody of him in another state in June 2019, the trial court properly overruled her motion for acquittal on Count I, and we deny Point One. The trial court erred in overruling her motion for acquittal on Count II because the State presented insufficient evidence that Hartwein completed the offense of interference with custody when A.H. failed to go with her at the bus stop. To the extent that insufficient evidence supports the conviction of the completed misdemeanor offense, we grant Point Two. However, the record supports finding

that the State sufficiently proved Hartwein committed attempted interference with custody and we enter judgment accordingly. Because the State showed by a preponderance of the evidence that Hartwein kept A.H. from the court proceedings with the intent to prevent A.H. from offering incriminating statements against her, the trial court did not err in allowing the State to offer A.H.'s hearsay testimony into evidence under the forfeiture-by-wrongdoing exception, and we deny Point There. Therefore, we affirm the trial court's judgment in part and reverse in part, reversing the conviction on Count II and entering judgment on attempted interference with custody. We remand the matter for the trial court to resentence the defendant consistent with this opinion.

## Factual and Procedural History

We recite the following facts viewing the evidence and its reasonable available inferences in the light most favorable to the jury's verdict. State v. Lehman, 617 S.W.3d 843, 846–47 (Mo. banc 2021) (quoting State v. Gilmore, 537 S.W.3d 342, 344 (Mo. banc 2018)). Hartwein's family law proceedings were incorporated into the record on appeal, and their relevant facts are included below.

Hartwein and Father married in 2005 and had one son, A.H., born in 2004. Hartwein and Father cross-petitioned to dissolve the marriage in 2009 and both sought sole legal and sole physical custody of A.H. Both parties alleged verbal and physical abuse by the other. The family court ordered visitation for Father during the pendency of the dissolution proceedings. The family court found Hartwein refused to allow visitation and held her in contempt following a hearing in November 2010. The trial court's judgment of modification pending dissolution proceedings included a contempt order (the "First Contempt Order"), which found Hartwein failed to comply with the visitation orders as well as other orders regarding paying the mortgage on the marital home and complying with psychological evaluations. The First Contempt Order

2

ordered Hartwein to vacate the marital home and awarded temporary sole legal and physical custody of A.H. to Father.

Hartwein sought a rehearing on the First Contempt Order, which the family court denied. Prior to trial, Father again moved to have Hartwein held in contempt. The dissolution case proceeded to trial in December 2010. Following trial, the family court entered its judgment (the "Original Dissolution Judgment") dissolving the marriage, distributing property, awarding Father sole legal and sole physical custody of A.H., ordering Hartwein to pay child support, and awarding Father attorneys' fees. The accompanying parenting plan granted Hartwein overnight visitation and temporary custody as well as a four-week summer vacation with A.H. pursuant to the notice provision. The Original Dissolution Judgment noted that any changes of residence must comply with the statutory notice provision and ordered the parties to keep each other apprised of current contact information. Hartwein appealed from the Original Dissolution Judgment, and we affirmed. See Hartwein v. Hartwein, 362 S.W.3d 484 (Mo. App. E.D. 2012).

In April 2016, Father moved to modify the Original Dissolution Judgment. Father also sought an order of contempt, again alleging that Hartwein had interfered with custody. Hartwein cross-moved to modify the Original Dissolution Judgment, alleging that changed circumstances required modifying the custody and child-support provisions. Following modification proceedings, during which Hartwein was sometimes represented by counsel and other times not, the family court granted Father's family access motion and issued its judgment in January 2017 (the "2017 Judgment"). The 2017 Judgment reaffirmed Father's sole legal and sole physical custody of A.H., with Hartwein having rights of visitation. The 2017 Judgment concluded Hartwein had interfered with Father's custody more than one hundred times and set forth a custody schedule that the family court ordered the parties to follow. The 2017 Judgment granted

3

Hartwein temporary custody of A.H. every Thursday evening after school starting February 2, 2017, and on alternate weeks Wednesday through Friday morning. Physical custody of A.H. was placed with Father at all other times. The 2017 Judgment expressly prohibited Hartwein from picking up A.H. from school on any days except Wednesday and Thursday.

The next month, Father moved to hold Hartwein in contempt of the 2017 Judgment, alleging Hartwein continued to deny him custody of A.H. The 2017 Judgment had ordered all parties to appear before the family court to determine an appropriate plan to purge Hartwein's contempt. Following a hearing at which Hartwein did not appear, the family court entered a judgment finding her in contempt of the 2017 Judgment (the "February 2017 Contempt Judgment"). In April 2017, Father moved for a warrant of commitment, alleging Hartwein had not offered to purge the contempt and continued to deny him the opportunity to exercise meaningful custody. The parties appeared before the family court, which granted Hartwein's request to purge the February 2017 Contempt Judgment on the condition that she follow the previously ordered custody schedule. Father subsequently sought a warrant of commitment alleging Hartwein continued in her failure to purge the February 2017 Contempt Judgment, but the family court set that judgment aside because no separate process had been issued. The family court entered an order to show cause and held multiple hearings during 2017 and 2018 on Father's contempt motion and on further modification proceedings for the 2017 Judgment.

In the modification proceedings, the family court issued its judgment and order on June 10, 2019 (the "2019 Judgment"). The family court concurrently issued a contempt Judgment (the "Contempt Judgment") finding Hartwein in contempt of the 2017 Judgment. The Contempt Judgment stated that Hartwein could purge the contempt by attending five sessions of counseling within sixty days and by delivering A.H. to the police department on June 14. The Contempt

4

Judgment directed the parties to appear before the family court on June 18 to determine the status of the purge agreement at that time. The 2019 Judgment found that Hartwein's conduct in keeping A.H. from Father was a substantial and continuing change of circumstance warranting modification. The 2019 Judgment Ordered that Father maintain sole legal and sole physical custody of A.H. and that Father remain the designated residential parent for education and mailing purposes. The 2019 Judgment also ordered Hartwein to pay attorneys' fees, ordered Hartwein to bring A.H. to the police department on June 14, and awarded Hartwein supervised visitation provided she complete five counseling sessions. The docket in the legal file reflects that a certified copy of the Contempt Judgment and 2019 Judgment was mailed to Hartwein at her pro se address on file with the court. Hartwein did not deliver A.H. to the police department on June 14 for the custody exchange. Officer Robert Fincher ("Fincher") went to Hartwein's registered local address and attempted to contact her there, but the home looked dark and vacant, and calls to her phone number reached only a busy signal. The family court entered a warrant of commitment, ordered the sheriff to take Hartwein into custody, and set a bond for $5,000. Hartwein moved to purge the Contempt Judgment, which the family court denied.

The State then charged Hartwein with two counts of interference with custody. The State filed a substitute information in lieu of an indictment. Felony Count I "Removed from State or Concealed" alleged that on or about June 14, 2019, Hartwein, knowing that she had no legal right to do so, took or enticed A.H. from the legal custody of Father, to whom the custody of A.H. had been entrusted by court order on June 10, 2019, and that Hartwein detained A.H. in another state. Misdemeanor Count II "Interference with Custody" alleged that on or about February 21, 2017, Hartwein, knowing she had no legal right to do so, took or enticed A.H. from the legal custody of Father, to whom custody had been entrusted by court order.

On June 24, 2019, Father again contacted police looking for A.H. Officer Fincher investigated and located A.H. in North Carolina with Hartwein. The State arrested Hartwein. A.H. was returned to Missouri. Hartwein pleaded not guilty on both counts, posted bond, and again moved to purge the Contempt Judgment. Hartwein alleged she had moved to North Carolina in November 2018 and was unaware of the 2019 Judgment and Contempt Judgment until she retained new counsel, who informed her of it in July 2019. The family court refused to set aside the Contempt Judgment. Hartwein moved to eliminate the conditions on her visitations with A.H., which the family court denied.

In March 2020, the State served Father with a subpoena for A.H. to appear at trial. A.H. was then fifteen years old and was entrusted to Father's legal custody. Father notified the State that A.H. had run away, and Father had not seen him since October 2019. The State sought to introduce into evidence certain out-of-court statements made by A.H. to law enforcement (the "Hearsay Statements"), arguing that it had reason to believe that A.H., a missing person, would fail to appear at trial and that the Hearsay Statements should be admitted under the forfeiture-by-wrongdoing exception. The trial court held a hearing on the State's motion, where it permitted the State to introduce the Hearsay Statements over Hartwein's objection and also took judicial notice of the files in the family court proceedings.

At the motion hearing, Hartwein, through her attorney, denied that A.H. was living with her in North Carolina. The State presented testimony from three police officers and A.H.'s friend's mother, Melissa Brinker ("Brinker"). Sergeant Scott Weeke ("Sergeant Weeke"), Sergeant Derek Myers ("Sergeant Myers") and Officer Nicholas Valenti ("Officer Valenti") testified about responding to calls involving A.H. and Hartwein.

Officer Valenti testified that as of the date of the motion hearing, A.H. was considered a missing person. A.H. had not appeared at his court appointment for Hartwein's criminal case. A.H. was supposed to be in his Father's custody but he was not with Father. Officer Valenti had no information as to whether A.H. could be located and retrieved from North Carolina or whether A.H. had been found and retrieved from North Carolina once before. Officer Valenti testified that he had responded to runaway juvenile calls relating to A.H. on October 12 and 13 of 2019 as well as to A.H.'s school on October 16, and that he spoke with A.H. about his living situation. Officer Valenti found A.H.'s statements about whether he was living with Hartwein to be misleading. When directly asked if he was living with Hartwein, A.H. told Officer Valenti to "[f]ind the evidence." Officer Valenti testified that he believed Hartwein had something to do with A.H. not being present for the trial and that he did not believe Hartwein when she told him she did not know A.H.'s location. Officer Valenti found it odd how A.H. was repeatedly missing and found, particularly when he went missing before his court appointment.

Brinker also testified about A.H.'s whereabouts during October 2019. Police had contacted Brinker about A.H. because A.H. and Brinker's son were friends. Brinker testified that on one occasion Hartwein came to Brinker's house looking for A.H., saying she had no idea where he was and was concerned.

Sergeants Weeke and Myers testified about the incident underlying Count II in which Hartwein attempted to pick up A.H. after school on February 21, 2017, in violation of the court order that A.H. go to Father's house on that date. The hearing and trial testimony adduced the following facts. Hartwein first went to the middle-school lobby and told the principal she was going to interfere with the court-ordered custodial plans. When A.H. was brought to where Hartwein was talking with the principal, Hartwein said she was going to take A.H. in her car, and

7

then told A.H. to get in her car rather than the bus. A.H. got on the bus. When police arrived, Hartwein left the school and drove to Father's neighborhood where she parked her car near the bus stop. The court order stated that A.H. was supposed to take the bus to Father's home on the day in question. A.H. initially refused to get off the bus and go to Father's house. The officers testified that when A.H. finally got off the bus, he was shaking, crying, and "seemed emotionally overwhelmed." A.H. told police how he had been living with Hartwein since October or November of 2016 and that he was supposed to get off the bus after school, get into Hartwein's car, and leave with her. A.H. told police that Hartwein usually made plans to pick him up from school or at a different bus stop or somewhere else. Hartwein admitted to police that she was aware of the court order but denied that she had contact with A.H. that day or that she was trying to pick him up from school. Hartwein stopped answering Sergeant Weeke's questions when he asked Hartwein if A.H. was lying when he told the officers about Hartwein's plan to pick A.H. up at school or at the bus stop. After police spoke with both A.H. and Hartwein at the bus stop, A.H. went into Father's house and did not leave with Hartwein.

Sergeant Weeke further testified that he believed A.H. had been coached by Hartwein about what to say during their conversations as to why he did not want to live with Father. Specifically, Sergeant Weeke commented that A.H.'s phrasing was almost identical to the phrasing that Hartwein had used when Sergeant Weeke asked her about her claims that Father was not feeding A.H., was emotionally abusing A.H., and had a hazardous microbiology lab in the basement of his home. Sergeant Weeke noted that A.H. said Father did not keep food that he liked in the house but that he was fed, that the alleged emotional abuse involved Father saying he was going to take A.H.'s phone and post an unflattering video of Hartwein online to embarrass her, and that A.H. was unable to describe the allegedly hazardous lab, which the family court

8

later concluded was related to Father's work testing consumer products and was not a source of concern. Additionally, Officer Valenti testified that Hartwein gave him a statement written by A.H. explaining why he should not live with Father but would not bring A.H. to speak with him in person. Officer Valenti considered the written statement unusual because portions of the statement had been whited out, and because the statement correctly spelled his last name despite its difficult spelling. Officer Valenti noted that A.H. had never written down his name or had taken his business card. Lastly, Officer Valenti explained that the letter brought by Hartwein used the word "traumatized," an expression previously used by Hartwein, but not by A.H.

Each of the motion-hearing witnesses denied on cross-examination that either Hartwein or A.H. had specifically told them that she intended to keep A.H. from coming to court to testify. After hearing arguments by both parties, the trial court issued its order granting the State's motion to admit the testimony under the exception for forfeiture by wrongdoing. The trial court noted that Hartwein continued to have contact with A.H. and to withhold information about A.H.'s whereabouts from law enforcement.

The criminal case proceeded to a jury trial in September 2020. At trial, the State re-introduced the record of the family-court proceedings to which Hartwein lodged no objection. The State also introduced, without defense objection, A.H.'s Hearsay Statements and other testimony substantially similar to that presented at the motion hearing. Officers, Father, and A.H.'s friend testified they had not seen A.H. since October 2019. While the record is unclear as to A.H.'s precise whereabouts at various times, the State focused on proving A.H.'s locations at the times relevant to the charged offenses. Hartwein did not testify or call witnesses at trial. At the close of the State's evidence and again at the close of all evidence, Hartwein moved for acquittal on both counts, which the trial court denied. During the jury instruction conference, the

9

State withdrew its proffered instruction on the lesser-included offense of attempted interference with custody on Count I. Hartwein raised no objections to the jury instructions. The jury convicted Hartwein on both charges. Hartwein moved for a new trial, renewing her hearsay claim, which the trial court denied. The trial court then sentenced Hartwein to four years in prison on Count I and one year on Count II, with both sentences to be served concurrently. Hartwein now appeals.

## Points on Appeal

Hartwein raises three points on appeal. Point One asserts the trial court erred in overruling Hartwein's motion for acquittal on Count I because the State failed to prove beyond a reasonable doubt that Hartwein knew of the 2019 Judgment as charged in the Substitute Information or that Hartwein removed A.H. from Missouri across state lines. In particular, Hartwein maintains the State adduced no evidence that Hartwein knew of the 2019 Judgment or that she had been in Missouri at the time she was found to have taken custody of A.H. Point Two contends the trial court erred in overruling Hartwein's motion for acquittal on Count II because the State only proved attempted interference with custody in that the facts clearly showed A.H. did not go with Hartwein at the bus stop. Point Three maintains the trial court erred in admitting A.H.'s Hearsay Testimony because the forfeiture-by-wrongdoing exception did not apply in that the State failed to prove that Hartwein procured A.H.'s unavailability with the intent to prevent him from testifying against her at the trial.

## Discussion

### I. Points One and Two—Sufficiency of the Evidence for Interference with Custody

#### A. Standard of Review

In her motion for new trial, Hartwein did not preserve her claims by challenging the sufficiency of the evidence generally nor by raising the specific challenges now argued on

10

appeal. However, "a claim that there is insufficient evidence to sustain a criminal conviction is preserved for review without regard to whether it was raised below." State v. Claycomb, 470 S.W.3d 358, 359 (Mo. banc 2015) (internal citation omitted); see Rule 29.11(d)(3)[1] ("In jury-tried cases, allegations of error to be preserved for appellate review must be included in a motion for new trial except for questions as to the following: . . . [t]he sufficiency of the evidence to sustain the conviction."). "While the better practice is to preserve specific claims of error for review, arguments concerning sufficiency of the evidence, even those not preserved for appeal, are reviewed on the merits, not for plain error. State v. Zetina-Torres, 482 S.W.3d 801, 808–09 (Mo. banc 2016) (citing Claycomb, 470 S.W.3d at 362). Therefore, we review Hartwein's sufficiency claims on their merits. See Rule 29.11; Claycomb, 470 S.W.3d at 359.

In finding whether there is sufficient evidence to support a conviction "and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but rather accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidences and inferences." Lehman, 617 S.W.3d at 846–47 (quoting Gilmore, 537 S.W.3d at 344); State v. Richardson, 22 S.W.3d 753, 757 (Mo. App. E.D. 2000) (internal citations omitted) (reviewing the sufficiency of the evidence on interference with custody). In reviewing a challenge to the trial court's ruling on a motion for a judgment of acquittal at the close of evidence, we review the evidence presented at trial before the jury is instructed. State v. Johnson, 603 S.W.3d 371, 376 (Mo. App. E.D. 2020) (internal citation omitted); see also Musacchio v. United States, 577 U.S. 237, 243 (2016) (internal citation omitted).

---

[1] All Rule references are to Mo. R. Crim. P. (2019).

11

"Circumstantial rather than direct evidence of a fact is sufficient to support a verdict." Lehman, 617 S.W.3d at 847 (internal citation omitted). "If that evidence supports equally valid inferences, it is up to the factfinder to determine which inference to believe, as '[t]he [factfinder] is permitted to draw such reasonable inferences from the evidence as the evidence will permit.'" Id. (internal quotation omitted) (alterations in original). Nevertheless, we will not "supply missing evidence or give the [S]tate the benefit of unreasonable, speculative or forced inferences." Id. (quoting State v. Langdon, 110 S.W.3d 807, 811–12 (Mo. banc 2003)). We ask "only whether there was sufficient evidence from which the trier of fact *reasonably* could have found the defendant guilty." Id. (quoting Claycomb, 470 S.W.3d at 362).

B.    Interference with Custody

The elements of the offense of interference with custody are found in Section 565.150.[2] "A person commits the offense of interference with custody if, knowing that he or she has no legal right to do so, he or she takes or entices from legal custody any person entrusted by order of a court to the custody of another person or institution." Section 565.150.1. Regarding the felony enhancement requirements, "[t]he offense of interference with custody is a class A misdemeanor unless the person taken or enticed away from legal custody is removed from this state, detained in another state or concealed, in which case it is a class E felony." Section 565.150.2.

### 1.    Point One—Count I, Felony Interference with Custody

Hartwein's contention in her first point on appeal challenges the sufficiency of the evidence on Count I. Hartwein initially asserts the trial court erred in overruling her motion for acquittal on Count I because the State failed to prove she had actual knowledge of the 2019 Judgment as referenced in the Substitute Information. The Substitute Information charged that

---

[2] All statutory references are to RSMo (2016), unless otherwise indicated.

12

on or about June 14, 2019, Hartwein, knowing that she had no legal right to do so, took or enticed A.H. from the legal custody of Father, to whom the custody of A.H. had been entrusted by court order on June 10, 2019, and that Hartwein detained A.H. in another state.

As Hartwein correctly notes, the State must prove the offense as charged. State v. Edwards, 537 S.W.3d 848, 851 (Mo. App. E.D. 2017) (internal citation omitted), *abrogated in part on other grounds by* State v. Williams, 548 S.W.3d 275, 285 (Mo. banc 2018). "[W]here the act constituting the crime is specified in the charge, the State is held to proof of that act, and the defendant may be convicted only on the basis of that act." Id. (internal citation omitted). However, as the State accurately observes, not every detail found within a charging document is pertinent to proving an element of the charged offense. See id. "Surplusage is the inclusion of words or phrases that are unnecessary to charge the statutory elements of the offense." State v. Patino, 12 S.W.3d 733, 738 (Mo. App. S.D. 1999) (internal citation omitted). "The purpose of an indictment is to enable the accused to make [a] defense and to enable him [or her] to assert double jeopardy in bar of a further prosecution[.]" State v. Bradshaw, 411 S.W.3d 399, 403 (Mo. App. S.D. 2013) (quoting State v. Nelson, 334 S.W.3d 189, 197 (Mo. App. W.D. 2011)); State v. Edwards, 510 S.W.3d 374, 379 (Mo. App. E.D. 2017) (quoting Nelson, 334 S.W.3d at 197). Thus, "[s]o long as the act proven falls within the statutory definition and the charging document informs the accused of that charge, inclusion of details of the commission of the offense is mere surplusage." Martinez v. State, 479 S.W.3d 728, 734 (Mo. App. S.D. 2015) (quoting Bradshaw, 411 S.W.3d at 403); see Edwards, 537 S.W.3d at 851 (internal citation omitted); Edwards, 510 S.W.3d at 379 (quoting Nelson, 334 S.W.3d at 197). Importantly, "[t]he State is not required to prove surplus language in the information." Bradshaw, 411 S.W.3d at 403 (quoting Nelson, 334 S.W.3d at 197); see also Section 545.030.1(14) ("No indictment or

13

information shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected: . . . (14) [f]or any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged[.]").

Here, we consider whether the Substitute Information's reference to the 2019 Judgment was necessary to prove the offense of interference with custody or constitutes mere surplusage that the State was not required to prove. The statute provides that "[a] person commits the offense of interference with custody if, knowing that he or she has no legal right to do so, he or she takes or entices from legal custody any person entrusted by order of a court to the custody of another person or institution." Section 565.150.1. The offense of interference with custody requires the State to prove the defendant had knowing intent to interfere with another's lawful custody. Id. "A person acts 'knowingly' with respect to his conduct or attendant circumstances when he is 'aware of the nature of his conduct or that those circumstances exist.'" State v. Licata, 501 S.W.3d 449, 452 (Mo. App. W.D. 2016) (quoting State v. Hunt, 451 S.W.3d 251, 257 (Mo. banc 2014) (quoting Section 562.016.3(1))). "The knowledge required to support a conviction for interference with custody is knowledge that a person has no legal right to take a person from the lawful custody of another." Id. at 452–53 (citing Section 565.150.1) (noting in review of a sufficiency claim that the State bore the burden to prove the defendant-mother took the child from the father knowing that she had no legal right to do so); State v. Slavens, 190 S.W.3d 410, 416 (Mo. App. S.D. 2006). "Intent can be established by circumstantial evidence or inferred from surrounding facts . . . before or even during the incident." State v. Younger, 640 S.W.3d 169, 171 (Mo. App. S.D. 2022) (quoting State v. Williams, 405 S.W.3d 592, 599 (Mo. App. S.D. 2013)).

14

Missouri courts have thus established that the intent element in Section 565.150 references a person's knowledge that he or she has no legal right to take or entice someone from the lawful custody of another. Licata, 501 S.W.3d at 452; Slavens, 190 S.W.3d at 416. Moreover, while a court order of custody is one means by which a defendant may acquire the requisite knowledge that he or she has no legal custody, a court order is not itself an element of the offense nor essential to proving the knowledge element. See Section 565.150.1; Younger, 640 S.W.3d at 171; Licata, 501 S.W.3d at 452; Slavens, 190 S.W.3d at 416. The Southern District recently clarified that a court order is not a required element of interference with custody. Younger, 640 S.W.3d at 171. In Younger, the defendant challenged the sufficiency of the evidence of his intent to commit interference with custody. Id. The Southern District upheld the conviction even though the facts of the case involved no court order of custody. Id. (finding sufficient evidence from which the jury could infer the defendant was aware he had no legal right to take a girl from her father's custody where the defendant parked down the road from her house and waited for her to sneak out to take her on an interstate road trip despite receiving numerous calls from friends and family to abandon the trip and admitting that continuing was "a bad idea"). We are not persuaded that the State was required to allege a specific court order in its Substitute Information as an element of the offense of interference with custody. Nor do we find that the 2019 Judgment was the sole source of Father's custody that served as the basis of Hartwein's conviction. See id.; compare Martinez, 479 S.W.3d at 734 (finding that because first-degree domestic assault does not require the assault be committed with a deadly weapon—but requires only that the actor know that the force used created a substantial risk of serious physical injury—the allegation in the information that the movant "thrust" a knife at the victim was mere surplusage that the State was not required to prove) and Bradshaw, 411 S.W.3d at

15

402–03 (finding that because kidnapping requires the act be committed to facilitate the commission of *any* felony, the allegation in the information that the defendant committed the offense to facilitate *first-degree* murder—even though the defendant was ultimately convicted on *second-degree* murder as charged—was mere surplusage that the State was not required to prove) with State v. Richie, 376 S.W.3d 58, 62–63 (Mo. App. E.D. 2012) (finding that because first-degree trespass must be committed either by unlawfully entering or unlawfully remaining on the property, the State was required to prove the defendant unlawfully entered the property as charged and could not rest its conviction on proving that the defendant unlawfully remained).

Section 565.150's felony-enhancement provision further illustrates the distinction between the operative language the State *must* include in its charging document and language that will be treated as mere surplusage. See Section 565.150.2. Specifically, while a court order is not an element of the offense, whether the defendant took or enticed a person from another's legal custody *and removed them from Missouri and detained them in another state* is the manner of committing the offense of interference with custody that determines whether the offense is a misdemeanor or a felony. See id. Notably, language relating to the removal from Missouri and detention in another state must be alleged in the charging document and proved at trial to obtain a felony conviction. See id. The Substitute Information's reference to the 2019 Judgment was not essential to proving that Hartwein knowingly interfered with Father's legal custody on or about June 14, 2019, but instead was mere surplusage that the State did not need to prove. See Edwards, 510 S.W.3d at 379 (quoting Nelson, 334 S.W.3d at 197); Martinez, 479 S.W.3d at 734 (quoting Bradshaw, 411 S.W.3d at 403). Rather, the State was required to charge and prove only that Hartwein knew she had no legal right to interfere with Father's lawful

16

custody on June 14, 2019, and detained A.H. in another state. See Section 565.150.1; Licata, 501 S.W.3d at 452.[3]

Because the State was not required to prove Hartwein's knowledge of the 2019 Judgment, despite the reference of the judgment in the Substitute Information, we consider whether the evidence introduced at trial regarding Hartwein's intent to commit interference with custody was sufficient to withstand Hartwein's motion for acquittal. See Licata, 501 S.W.3d at 454–55. At trial, the State introduced the prior family-court proceedings into evidence. Hartwein affirmatively stated no objection to the admission of the family court proceedings. See State v. Taylor, 636 S.W.3d 630, 635 (Mo. App. S.D. 2021) (quoting State v. Hughes, 563 S.W.3d 119, 125 (Mo. banc 2018)) ("[I]f a defendant not only fails to object but also states 'no

---

[3] Hartwein reasons in her reply brief that the State's failure to reference the 2019 Judgment in its verdict director suggests an admission by the State that it lacked evidence to prove her knowledge of the judgment, thereby supporting her argument that insufficient evidence supported her conviction. But Hartwein raised neither a claim of variance nor instructional error at trial or on appeal. Indeed, the parties on appeal have raised the issue of whether Point One is actually an unraised variance claim or jury-instruction claim framed as a sufficiency challenge. Missouri courts have repeatedly rejected sufficiency-of-the-evidence claims that are disguised variance claims. See, e.g., Edwards, 510 S.W.3d at 379 (citing Nelson, 334 S.W.3d at 197) (finding the defendant's claim that insufficient evidence supported conviction as charged in the indictment was essentially a claim of variance between the evidence at trial and the charging document that the defendant failed to preserve for appellate review); Bradshaw, 411 S.W.3d at 403 (internal citations omitted) (finding the "[d]efendant is simply attempting to cast his unpreserved claim of variance as a claim of insufficient evidence"). Any challenge Hartwein may have had regarding a variance between the charging document and the evidence at trial or the State's failure to refer to the 2019 Judgment in its verdict directing instruction was waived. See Watson v. State, 545 S.W.3d 909, 914 (Mo. App. W.D. 2018) (internal citation omitted) ("A claim of trial court error not raised on appeal is waived[.]"). Notably, Hartwein did not raise the same challenge to Count II, for which the Substitute Information did not identify any particular court order but generally referenced the legal custody of Father "to whom the custody of A.H. had been entrusted by order the St. Charles County Associate Circuit Court, State of Missouri."

Furthermore, concerning the verdict director, "[a] claim that the evidence was insufficient is actually a challenge to the trial court's ruling on the motion for judgment of acquittal at the close of evidence, which is filed *before* the case is submitted to the jury." Johnson, 603 S.W.3d at 376 (internal citation omitted). "Thus the real question is whether by the close of evidence the State has presented sufficient evidence to submit the case to the jury, which is reviewed *without regard* to the verdict-director." Id. (internal citation omitted); see Musacchio, 577 U.S. at 243 (noting a reviewing court's determination on the sufficiency of the evidence does not rest on how the jury was instructed but rather on the legal question of whether the State presented sufficient evidence to submit the case to a jury); see also Rule 27.07 ("The [trial] court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."). Accordingly, Hartwein's appeal from the trial court's denial of her motion for acquittal must be reviewed for the sufficiency of the evidence presented at trial, rather than based on any alleged error in the charging document or jury instructions. See Johnson, 603 S.W.3d at 376 (internal citation omitted); Edwards, 510 S.W.3d at 379 (internal citation omitted).

17

objection' or stipulates to the admission of otherwise objectionable evidence, the defendant affirmatively waives any error in its admission, plain or otherwise."). Hartwein argues the trial court was required to grant her motion for acquittal unless the State could prove her receipt of the 2019 Judgment prior to the date of the offense—June 14, 2019. Without knowledge of the 2019 Judgment, Hartwein posits that she could not have known she had no legal right to exercise custody over A.H. at the time in question or that she was interfering with Father's lawful custody. Hartwein's argument is unavailing given the ample circumstantial evidence in the record to the contrary. See Lehman, 617 S.W.3d at 847 (internal citation omitted); Younger, 640 S.W.3d at 171 (quoting State v. Thompson, 538 S.W.3d 390, 393 (Mo. App. W.D. 2018)) ("The intent to commit interference with custody may be inferred from the "defendant's conduct before the act, from the act itself, and from [the] defendant's subsequent conduct."); Licata, 501 S.W.3d at 452–53 (internal citation omitted).

Considering the record in the light most favorable to conviction, we note that the 2019 Judgment merely retained Father's legal custody of A.H. as ordered in the 2017 Judgment, the contents of which Hartwein undisputedly had full notice and knowledge. See Lehman, 617 S.W.3d at 847 (internal citation omitted). Specifically, the 2019 Judgment ordered that Father maintain the sole legal and physical custody of A.H. *previously entrusted to Father*. The record establishes Hartwein knew that the prior 2017 Judgment had awarded Father sole legal and sole physical custody and granted Hartwein temporary custody and visitation that prohibited her from picking up A.H. from school on any days but Wednesdays and Thursdays. Hartwein identifies nothing in the record suggesting that any of the numerous hearings following the 2017 Judgment resulted in any family court orders altering that custody arrangement. Thus, the record of prior proceedings in the family court, of which the trial court took judicial notice, clearly establishes

18

Hartwein's knowledge that, at the very least, Father had sole legal and physical custody over A.H. since 2017, while Hartwein had only limited rights of visitation and temporary physical custody of A.H. two days a week. Police officers, Father, and A.H.'s friend testified at trial that A.H. had not been seen since October 2019. Although she presented no testimony at trial, part of Hartwein's theory of defense to Count I was that she had moved to North Carolina in 2018. A reasonable inference arises that A.H. moved to North Carolina with Hartwein in 2018 and remained with Hartwein in North Carolina on June 14, 2019. This evidence supports a finding that Hartwein had custody of A.H. knowing she had no legal right to do so and knowing A.H. had been entrusted to Father's custody by successive court orders from 2017 and even earlier thereto. See Licata, 501 S.W.3d at 452–53 (internal citation omitted). The record before us contains facts in evidence that in June 2019, Hartwein knew of her limited visitation and custodial rights that predated the 2019 Judgment and that she was exceeding her exercise of temporary physical custody over A.H. without any legal right. See id.; see also Slavens, 190 S.W.3d at 415 (finding insufficient evidence of intent to commit interference with custody where the record was devoid of evidence that the defendant was ever informed that the Department of Family Services had acquired legal custody over the child).[4]

---

[4] Hartwein also posits for the first time on appeal that she may have had lawful custody of A.H. on the charged date as an exercise of the Original Dissolution Judgment's parenting-plan provision that each party receive four weeks of summer vacation with A.H. Although Hartwein did not preserve the issue by raising it at trial, she alleges that she did not raise it as a defense because the State only charged her with violating the 2019 Judgment ordering her to deliver A.H. into Father's custody at a police station on June 14, 2019. Hartwein maintains that because she believed the State would fail to prove her knowledge of the 2019 Judgment, she had no burden to put on any defense as to why she believed she had legal custody at the time of the offense. However, the Substitute Information sufficiently put her on notice of the charge that she was interfering with Father's legal custody on or about June 14, 2019. See Edwards, 510 S.W.3d at 379 (quoting Nelson, 334 S.W.3d at 197); Martinez, 479 S.W.3d at 734 (quoting Bradshaw, 411 S.W.3d at 403). The 2019 Judgment is not an element of the offense of interference with custody but is merely the most recent court order *maintaining* the legal custody that had been entrusted to Father since the beginning of the litigation. The record shows that Hartwein was acutely aware of court orders granting Father legal and physical custody and restricting her to limited, temporary physical custody, dependent on both attending counseling sessions and adhering to the Original Dissolution Judgment's notice provisions for custody exchanges and address changes. The circumstantial evidence at trial established that Hartwein knew she was interfering with court-ordered custody by taking A.H. to North Carolina in 2018 and keeping him there through the date of the

19

Because the charge of interference with custody against Hartwein did not require the 2019 Judgment be pleaded as an element of the offense, the reference to the 2019 Judgment in the Substitute Information was surplusage that the State was not required to prove at trial. Accordingly, proof of Hartwein's knowledge of that particular judgment was not required for the trial court to properly overrule Hartwein's motion for acquittal. See Edwards, 510 S.W.3d at 379 (quoting Nelson, 334 S.W.3d at 197); Martinez, 479 S.W.3d at 734 (quoting Bradshaw, 411 S.W.3d at 403); see also Section 565.150.1; Younger, 640 S.W.3d at 171; Licata, 501 S.W.3d at 452. Further, through trial testimony and prior court orders entrusting custody over A.H. to Father, the State adduced sufficient evidence proving Hartwein had the requisite knowing intent to commit interference with Father's legal custody on Count I such that the trial court did not err in denying her motion for acquittal. See Licata, 501 S.W.3d at 452–53 (internal citation omitted).

We next turn to the timing issue Hartwein raises on Count I. Hartwein reasons that evidence she resided in North Carolina in June 2019 is not evidence that she traveled to Missouri and took A.H. from Missouri across state lines on June 14, 2019.

Hartwein's sufficiency claim as to timing is misguided because the State was not required to prove that Hartwein removed A.H. from Missouri on June 14, 2019, the date on which she was charged with interfering with Father's legal custody. See id. In Licata, the defendant claimed that any offense she committed was only a misdemeanor under the statute because the evidence showed she did not remove the child from Missouri until a month after the date the

<hr>

offense. See Lehman, 617 S.W.3d at 847 (internal citation omitted); Younger, 640 S.W.3d at 171 (citing Thompson, 538 S.W.3d at 393); Licata, 501 S.W.3d at 452–53 (internal citation omitted). Hartwein's mistaken belief that the Substitute Information's reference to the 2019 Judgment absolved her of the need to defend any ground other than her knowledge of the 2019 Judgment is not availing, because we find the detail was mere surplusage that the State did not need to prove. See Edwards, 510 S.W.3d at 379 (quoting Nelson, 334 S.W.3d at 197); Martinez, 479 S.W.3d at 734 (citing Bradshaw, 411 S.W.3d at 403).

20

State charged in the information. Id. at 452. The Western District denied the claim, noting first that the State charged simply that the defendant had failed to return the child to the father's custody on the named date, not that the act of removal occurred then. Id. at 452–53. But most important, the Western District noted that with respect to a taking under the offense of interference with custody, *"the statute does not require the removal to be simultaneous with the actual taking* in order to elevate the punishment to a class D felony." Id. at 455 (emphasis added).

Here, the Substitute Information charged that "on or about June 14, 2019 . . . [Hartwein], knowing that [she] had no legal right to do so, took or enticed A.H. from the legal custody of [Father] to whom the custody of A.H. had been entrusted by [court] order . . . and [Hartwein] detained A.H. in another state[.]" As discussed above, the record contains sufficient evidence that Hartwein was keeping A.H. in North Carolina on the date of the offense, thereby interfering with Father's custody as charged. Hartwein essentially argues that she cannot be found guilty of interference with custody on June 14, 2019, because by that date she had *already* taken A.H. across state lines in violation of a prior court order. Hartwein's argument that the State had to prove she was physically in Missouri and removed him from the state on the date of the charged offense is without merit. See id. The trial court did not err in denying Hartwein's motion for acquittal on Count I. See Lehman, 617 S.W.3d at 847 (internal citation omitted). Point One is denied.

### 2. Point Two—Count II, Misdemeanor Interference with Custody

Point Two challenges the sufficiency of the evidence on Count II, which relates to events occurring in February 2017. Specifically, Hartwein maintains the State failed to prove she took or enticed A.H. from Father's custody because A.H. did not leave with her on February 21, 2017,

21

but went to Father's home. Hartwein contends that these facts show only that she *attempted* to interfere with custody. Because Hartwein did not succeed in her attempt to take or entice A.H. from Father, she argues that insufficient evidence supports conviction on Count II.

"In applying a criminal statute, 'our primary role is to ascertain the intent of the legislature from the language used in the statute and, if possible, give effect to that intent.'" Slavens, 190 S.W.3d at 412 (internal quotation omitted). Interpreting Section 565.150, "the purpose of the . . . statute is to protect *all* court ordered custody against unlawful interferences." Licata, 501 S.W.3d at 453 (internal quotation omitted). In ascertaining the meaning of the relevant statutory phrase "takes or entices from legal custody," Missouri courts have interpreted the word "takes" to include "unlawful retention of any person following a period of temporary lawful custody.'" Id. (quoting State v. Edmisten, 674 S.W.2d 576, 577 (Mo. App. E.D. 1984)). Here, however, the parties on appeal focus on the meaning of the word "entice." The legislature's choice to use the disjunctive connector "or" in the phrase "takes or entices" indicates the legislative intent that a defendant may commit the offense by *either* taking or enticing the child from another's custody. See State v. Hardin, 429 S.W.3d 417, 419 (Mo. banc 2014) (internal quotation omitted) (noting ("[t]he disjunctive 'or' . . . in its ordinary sense marks an alternative which generally corresponds to the word 'either'" and that any ambiguity in a criminal statute will be construed in the defendant's favor). The State concedes no taking of A.H. from Father's custody occurred here. At trial, in response to Hartwein's motion for acquittal, the State noted that the charge against Hartwein was for interference with custody, not necessarily physically taking A.H. On appeal, the State maintains it proved Hartwein enticed A.H. from Father's custody and did not have to prove Hartwein physically removed A.H. from Father's custody. Contrastingly, Hartwein argues that to prove interference with custody by

22

taking *or* enticing someone from another's custody, the State must prove that the defendant succeeded in causing the child to leave or be removed from another's custody.

Because neither the statute nor Chapter 565 offers a definition of "entice," we consider the term's plain and ordinary meaning. See State v. Smith, 595 S.W.3d 143, 146 (Mo. banc 2020) (internal quotation omitted) (noting where a term is not defined by statute it is given its plain and ordinary meaning as derived from the dictionary). Furthermore, we must interpret the word within its full statutory context. Macon Cnty. Emergency Servs. Bd. v. Macon Cnty. Comm'n, 485 S.W.3d 353, 355 (Mo. banc 2016) (internal citation omitted) ("It is presumed that each word, clause, sentence, and section of a statute will be given meaning and that the legislature did not insert superfluous language."). We find that the plain meaning of the statutory phrase "entices from legal custody" in Section 565.150.1 suggests a physical separation from the person or entity afforded legal custody. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 757, 913 (2002) (defining "entice" as "to incite, instigate" and "to draw on by arousing hope or desire" and noting "from" is "used as a function word to indicate a starting point: as (1) a point or place where an actual physical movement (as of departure, withdrawal, or dropping) has its beginning" and "to indicate (1) the fact or condition of spatial or physical absence, separation, remoteness, or disjunction"). Thus, for either action verb in the statute—take or entice—the State needed to prove Hartwein took or enticed A.H. *from* Father's lawful custody, which we are persuaded requires a physical transfer of custody occurred to constitute the completed offense. See Section 565.150.1.

As Hartwein observes, we also note that the term "enticement" is used in Section 566.151, which criminalizes the enticement of a child. Therein, Section 566.151 defines "enticement" as "persuade[ ], solicit[ ], coax[ ], entice[ ] or lure[ ] whether by words, actions or

23

through communication via the internet or any electronic communication[.]" State v. Davies, 330 S.W.3d 775, 784 (Mo. App. W.D. 2010) (quoting Section 566.151.1) (holding the State insufficiently proved the completed offense of enticement of a child). We acknowledge the State's point that Hartwein's argument overstates the relevance of Davies in that the unproven element there was not the acts of enticement but instead the victim's age. See id. at 785–86. In Davies, because the victim was not under fifteen as required by the statute, the State failed to prove the completed offense. See id. at 787; see also State v. Conner, 583 S.W.3d 102, 110 (Mo. App. E.D. 2019) (reversing conviction on child enticement and entering conviction for attempted child enticement on the same grounds). Davies, however, is distinguishable from the present case not only because it involves a different, unrelated offense, but also because enticement of a child contains different statutory language than the offense of interference with custody. In particular, enticement of a child uses a different prepositional phrase, in that a person commits the offense "if he or she persuades, solicits, coaxes, *entices*, or lures . . . any person who is less than fifteen years of age *for* the purpose of engaging in sexual conduct." Section 566.151.1 (emphasis added). The grammatical placement of "entice" differs between the two statutes, and we must therefore meaningfully distinguish between enticing someone *for* a particular purpose versus enticing someone *from* another's custody. See Sections 565.150.1; 566.151.1; Macon, 485 S.W.3d at 355 (internal citation omitted).

Considering the statute's purpose and its plain language, we are not convinced the legislature intended to criminalize merely trying to persuade a person to leave another's lawful custody, but rather that the defendant actually interfere with the custodial arrangement either by taking the person away, such as carrying an infant, or by persuading the person to leave, such as convincing a teenager to sneak out of a parent's home. See, e.g., Younger, 640 S.W.3d at 171;

24

see also Slavens, 190 S.W.3d at 413 (internal quotation omitted) (noting the Missouri legislature is aware that the Model Penal Code distinguishes between interference with custody and kidnapping, as "kidnapping protects against physical danger, extortion, and terrorization by abduction" while interference with custody "is designed to maintain both the parental custody of children and the institutional authority over committed persons against all unlawful interference"). Because the legislature employed the phrase "takes or entices from" another's legal custody, the State must prove the completed offense by showing the defendant enticed the child to physically separate from another's lawful custody. Here, consistent with the statutory phrase "takes or entices from legal custody," the State was required to present evidence either that Hartwein took or unlawfully kept A.H. from Father's custody or that Hartwein persuaded or coaxed A.H. to separate from Father of his own volition. Critically, the State needed to prove that A.H. left with Hartwein on February 21, 2017, in order to charge her with the completed offense of interference with custody. Even in the light most favorable to the verdict, A.H. did not leave with Hartwein but instead ultimately went to Father's home after school as required by court order. The record thus contains insufficient evidence from which a reasonable juror could find that Hartwein enticed A.H. from Father's legal custody. See Licata, 501 S.W.3d at 452–53. The trial court erred in upholding Hartwein's conviction on the completed offense. See Lehman, 617 S.W.3d at 847 (internal citation omitted); Davies, 330 S.W.3d at 787.

We note, however, that because notice to a defendant that he or she is charged with an offense also puts him or her on notice for lesser-included offenses, we may enter a conviction for a lesser-included offense if it is proved by the State, even if it is uncharged or uninstructed. State v. Blair, 443 S.W.3d 677, 686 (Mo. App. W.D. 2014) (citing Davies, 330 S.W.3d at 791). Hartwein disputes the propriety of our entering an attempt conviction on Count II due to the

25

State's actions at trial. However, although the State affirmatively declined to submit an instruction for a lesser-included offense on Count I, the State did not affirmatively do so on Count II or otherwise indicate a conscious and strategic position against submitting the attempted offense for Count II to the jury such that it waived conviction of the attempted offense on appeal. See id. (declining to enter a conviction for a lesser-included offense where the State affirmatively waived consideration of any lesser included offense at trial and on appeal).

"Where a conviction of a greater offense has been overturned for insufficiency of the evidence, the reviewing court may enter a conviction for a lesser offense if the evidence was sufficient for the jury to find each of the elements and the jury was required to find those elements to enter the ill-fated conviction on the greater offense." State v. Umfleet, 621 S.W.3d 15, 27 (Mo. App. E.D. 2021) (quoting State v. Ahart, 609 S.W.3d 512, 518 (Mo. App. E.D. 2020)). We may enter a conviction on the charge of attempted interference with custody if the evidence supports finding Hartwein had the intent to commit the offense and took a substantial step towards the completion of the offense. See Section 562.012.1; State v. Craig, 498 S.W.3d 459, 464 (Mo. App. W.D. 2016) (internal citation omitted). A substantial step is "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." Section 562.012.1. "What act will constitute a substantial step depends on the facts of the particular case." State v. Rice, 504 S.W.3d 198, 202 (Mo.App. W.D. 2016) (quoting Davies, 330 S.W.3d at 791).

The evidence showed the following: Hartwein went to the school on the date of the offense, February 21, 2017, and told school officers that she intended to interfere with the custodial plan and take A.H. with her in her car. After police arrived at the school and A.H. got onto a school bus, Hartwein drove to Father's neighborhood and stopped her car near the bus

26

stop. Police officers also followed the bus to Father's neighborhood. Police officers spoke with A.H. when he refused to get off the bus. On this Tuesday, Father had sole legal and physical custody of A.H., whereas Hartwein was permitted to pick up A.H. from school on Wednesdays and Thursdays only. The court order specifically prohibited Hartwein from picking up A.H. from school on any other day and clarified that A.H. was supposed to take the bus to Father's home on the day in question. A.H. told police that he had not seen his Father since the previous October or November. When asked where he was going every day after school, A.H. told police that Hartwein usually made plans for her to pick him up from school or at a different bus stop or somewhere else. A.H. told police he had been living with Hartwein since roughly November of the previous year, and that on this day he was supposed to get off the bus and get into Hartwein's car and leave with her. With several police present at the bus stop, A.H. did not leave with Hartwein but instead went to Father's house. Given the record before us, particularly the evidence that Hartwein admitted her intent to commit interference with custody and that she took steps to do so, including making arrangements with A.H., the record contains sufficient evidence that Hartwein took a substantial step strongly corroborative of the firmness of her intent to commit the offense, thereby supporting her conviction on attempted interreference with custody. See id. (internal citation omitted).

We find the trial court erred in entering judgment convicting Hartwein of the completed misdemeanor offense of interference with custody on Count II. See Lehman, 617 S.W.3d at 847 (internal citation omitted). Point Two is granted. We reverse the judgment of conviction on Count II and enter judgment of conviction on the lesser-included offense of attempted interference with custody. See Umfleet, 621 S.W.3d at 27 (quoting Ahart, 609 S.W.3d at 518).

27

## II. Point Three—Admission of Hearsay Testimony

Point Three posits the trial court erred in admitting A.H.'s Hearsay Statements under the exception for forfeiture by wrongdoing. In particular, Hartwein asserts the State failed to prove that Hartwein procured A.H.'s unavailability with the intent to prevent him from testifying at trial, and therefore the trial court erred in applying the exception.

### A. Preservation and Standard of Review

As a threshold matter, Hartwein suggests Point Three was preserved through her pretrial objections argued before the trial court in the motion hearing and again in her motion for new trial. The State counters that only plain-error review is appropriate because Hartwein did not renew her objection when the contested testimony was introduced during trial. Hartwein contends that the trial court granted her a continuing objection at the pre-trial motion hearing. To support her claim, Hartwein points to an exchange during the pre-trial hearing on the State's motion to include A.H.'s Hearsay Statements in which Hartwein objected, on grounds of relevance, to Sergeant Weeke's testimony that he learned of Hartwein's alleged court-order violation through Sergeant Myers. In her objection, Hartwein explained that the only relevant information to whether she was preventing A.H. from testifying at trial with the requisite intent to keep him from testifying against her was her present behavior and actions as opposed to evidence from three years ago. The trial court overruled her objection. Hartwein then requested an "ongoing objection to any of the evidence that happened previously," and the trial court granted her request. On appeal, Hartwein maintains that her ongoing relevance objection to any previous evidence at the motion hearing preserved her objection to A.H.'s Hearsay Statements at trial on the same grounds alleged in Point Three, relying on State v. Flieger, 776 S.W.2d 25, 28 (Mo. App. E.D. 1989) (finding the defendant preserved his objection to privileged

28

communications with his ex-wife where the defendant specifically requested a continuing objection at a pretrial hearing). However, we find the record insufficient to establish that Hartwein was granted a continuing objection to A.H.'s Hearsay Statements effective through trial. We recognize that converting a pre-trial objection into a continuing objection "represents an appropriate method by which one can preserve issues for appeal." State v. Beishline, 926 S.W.2d 501, 508 (Mo. App. W.D. 1996) (internal citation omitted) (finding that a defendant may convert a motion to suppress evidence into a continuing objection to the admission of the contested evidence at trial); but see State v. Christian, 184 S.W.3d 597, 605 n.1 (Mo. App. E.D. 2006) (internal citations omitted) (noting "a 'continuing objection' presupposes an initial objection to all questions in a given line of questioning . . . [and] [t]his initial objection must be made at trial to preserve a claim for review"). However, in her opening brief, Hartwein did not refer to the portion of the record containing her request for an "ongoing objection" in her statement of preservation, and we are not persuaded the record made clear that she was seeking an objection to A.H.'s Hearsay Statements, which the State had not yet attempted to introduce, or that seeking a continuing objection would be effective to preserve the issue not only throughout the hearing but through trial. The record does not establish that the trial court's grant of an ongoing objection to all previous evidence reflected conversion of a pre-trial objection to A.H.'s Hearsay Statements into a continuing objection effective through trial. See Christian, 184 S.W.3d at 605 n.1 (finding the record did not support the defendant's claim that he had a continuing objection even though there was pre-trial discussion about whether certain other of defendant's statements would be admitted).

Because Hartwein did not establish a continuing objection and did not preserve her objection at trial, we may review Point Three only for plain error under Rule 30.20. See State v.

Schneider, 483 S.W.3d 495, 504 (Mo. App. E.D. 2016) (internal citation omitted) ("Failure to make a specific objection to the evidence at the time of its attempted admission waives the claim for appeal."). Indeed, "Missouri courts strictly apply these principles based on the notion that trial judges should be given an opportunity to reconsider their prior rulings against the backdrop of the evidence actually adduced and in light of the circumstances that exist when the questioned evidence is actually proffered." Id. (internal quotation omitted).

The State asks us to decline plain-error review because Hartwein failed to object to the Hearsay Statements as a matter of trial strategy. See State v. Johnson, 284 S.W.3d 561, 582 (Mo. banc 2009) (internal citation omitted); State v. Shigemura, 552 S.W.3d 734, 745 (Mo. App. E.D. 2018) (internal citation omitted). "Plain error review is waived when 'counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or negligence.'" Johnson, 284 S.W.3d at 582 (internal quotation omitted). "Plain error review does not apply when 'a party affirmatively states that it has no objection to evidence an opposing party is attempting to introduce' *or for a trial strategy reason.*" Id. (emphasis added); Shigemura, 552 S.W.3d at 745 (internal quotation omitted). Here, the State suggests Hartwein affirmatively acted in a manner that precludes finding the failure to object was inadvertent, given that Hartwein may have strategically decided to forgo objections to A.H.'s hearsay statements in order to allow for the admission of other statements by A.H. that were favorable to the defense.

The record shows that Hartwein vigorously defended against the State's pretrial motion to admit the Hearsay Statements and later included the objection in her motion for new trial. At trial, although not objecting when the Hearsay Statements were offered into evidence by the State, Hartwein did not affirmatively state she had no objection to A.H.'s Hearsay Statements or

30

otherwise acquiesce to the introduction of the Hearsay Statements. See Johnson, 284 S.W.3d at 582 (noting that affirmatively stating "no objection" constitutes self-invited waiving discretionary plain-error review). We are not persuaded from the record that Hartwein's cross-examination into the substance of the Hearsay Statements clearly demonstrated a strategic decision not to contest their admission into evidence. See Shigemura, 552 S.W.3d at 745 (finding the defendant waived plain-error review by not objecting to the confidential-tip testimony as a strategy to allow the limited testimony in through the State's direct examination, then deliberately reiterating and expanding on the complained-of testimony during cross-examination in an attempt to show the jury that the officers were predetermined to arrest the defendant). The Hearsay Statements were damaging to Hartwein for the charged offenses. We may construe her cross-examination as an attempt to mitigate their impact by focusing on certain details in the testimony relevant to A.H.'s living conditions with Father that were favorable to her case. Additionally, while the State points to other hearsay testimony by A.H. on the subject of his home life with Father that Hartwein elicited from other witnesses—including A.H.'s text messages to Father, A.H.'s statements to the assistant principal at a school meeting, and A.H.'s statements to his friend—the State was free to object to such testimony, and we do not find the testimony necessarily indicative of an overarching trial strategy suggesting Hartwein affirmatively waived plain-error review of her pretrial and post-trial claims contesting admission of the Hearsay Statements. Hartwein's failure to renew her objection during trial is problematic, but does not automatically suggest a strategy of self-invited error. To find otherwise would require us to speculate as to counsel's trial strategy, for which we have no testimony in the record nor any conclusions of a trial or motion court to review as in a post-conviction case. See, e.g., Stevens v. State, 353 S.W.3d 425, 431 (Mo. App. S.D. 2011) (internal citation omitted)

31

("We do not employ hindsight in reviewing matters of trial strategy[.]"). Because the record does not clearly show an affirmative strategic decision for the failure to object at trial, and because the issues of law were fully briefed and considered before the trial court, we proceed with plain-error review. See Johnson, 284 S.W.3d at 582 (internal citation omitted).

"Unpreserved issues can only be reviewed for plain error, which requires a finding that manifest injustice or a miscarriage of justice has resulted from the trial court error." State v. Brandolese, 601 S.W.3d 519, 534 (Mo. banc 2020) (internal quotation omitted). The first step of plain-error review is to determine whether the trial court committed an error that was "evident, obvious, and clear." Shigemura, 552 S.W.3d at 744 (internal quotation omitted). Only if we find such error do we next consider "whether 'a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." Id. (internal quotation omitted). Although we review the claim overall for plain error, "whether a criminal defendant's rights were violated under the Confrontation Clause . . . is a question of law that this Court reviews de novo." State v. Buechting, 633 S.W.3d 367, 376 (Mo. App. E.D. 2021) (quoting State v. March, 216 S.W.3d 663, 664–65 (Mo. banc 2007)) (alteration in original).

B.    A.H.'s Hearsay Statements were Testimonial

Recognizing the hearsay nature and Confrontation Clause implications of A.H.'s out-of-court statements, the State made a pre-trial motion requesting the Court to allow admission of A.H.'s Hearsay Statements under the exception of forfeiture by wrongdoing. On appeal, the State disputes whether the Hearsay Statements were testimonial in nature so as to trigger the protection of the Confrontation Clause.

The Confrontation Clause of the Sixth Amendment to the United States Constitution bars admission of unconfronted testimonial statements of a witness who does not appear at trial.

32

Buechting, 633 S.W.3d at 376 (citing U.S. Const. Amend. VI.). "'Hearsay' is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." Id. (internal citation omitted). "The Supreme Court of the United States has held that the Confrontation Clause prohibits 'admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" State v. Cooper, 509 S.W.3d 854, 857–58 (Mo. App. S.D. 2017) (quoting Crawford v. Washington, 541 U.S. 36, 53–54 (2004)). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id. at 858 (quoting Davis v. Washington, 547 U.S. 813, 821 (2006)).

"The Confrontation Clause analysis thus centers on whether the particular evidence at issue is 'testimonial' in nature." Id. (quoting Glass v. State, 227 S.W.3d 463, 472 (Mo. banc 2007)). "[A] testimonial out-of-court statement is not admissible against the defendant under the Confrontation Clause unless the requirements of Crawford v. Washington, 541 U.S. 36 [ ] (2004), are met." Brandolese, 601 S.W.3d at 535 (internal citation omitted). Missouri courts have held that hearsay statements made to police officers are not testimonial when made in the course of police questioning where the primary purpose is to respond to an ongoing emergency. State v. Burns, 478 S.W.3d 520, 526 (Mo. App. E.D. 2015) (quoting Davis, 547 U.S. at 822). But hearsay statements made to police "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation *is to establish or prove past events potentially relevant to later criminal prosecution.*" Cooper, 509 S.W.3d at 858 (quoting Davis, 547 U.S. at 822) (emphasis added); Burns, 478 S.W.3d at 526 (quoting Davis, 547 U.S. at 822).

33

Here, the State submits that the record demonstrates A.H.'s Hearsay Statements to the police officers were not testimonial because they were offered for the primary purpose of explaining the police officers' emergency response. Specifically, police officers had been called to the school to assist when Hartwein showed up at the school to pick up A.H. The Hearsay Statements were elicited from A.H. only after A.H. showed distress and refused to get off the school bus at the bus stop by Father's house. In Cooper, the victim's statements to police were elicited after the victim had already identified the defendant as a suspect at the scene and was asked what *had* happened. Cooper, 509 S.W.3d at 858. The statements in Cooper were deemed testimonial in nature because the primary purpose of the police officer's questioning was not at that point to assist in an ongoing emergency but instead to investigate the scene for the purpose of gathering information to be used in criminal prosecution. Id. Here, similarly, even after the police officers persuaded A.H. to get off the bus, they continued to interrogate him about past events involving his custodial situation with Hartwein, suggesting their primary purpose at that point was not responding to any ongoing emergency, but instead to investigate details relevant to a potential case against Hartwein. See id. Because A.H.'s Hearsay Statements were testimonial, we proceed in our analysis of whether Hartwein's constitutional rights were violated. See id. (citing Davis, 547 U.S. at 822).

C.     A.H.'s Hearsay Statements were Properly Admitted into Evidence

At the pretrial hearing, both Hartwein and the State advanced their arguments regarding the applicability of the forfeiture-by-wrongdoing exception as discussed by the Supreme Court of Missouri in State v. McLaughlin, 265 S.W.3d 257 (Mo. banc 2008). The exception, which has since been codified by statute,[5] provided "that 'if a witness is absent by [the defendant's] own

---

[5] Subsequent to the trial court's evidentiary ruling in this case, the Missouri legislature codified the forfeiture-by-wrongdoing doctrine in Section 491.016, which now provides:

34

wrongful procurement, [the defendant] cannot complain if competent evidence is admitted to supply the place of that which he has kept away." Buechting, 633 S.W.3d at 377–78 (quoting McLaughlin, 265 S.W.3d at 271) (alterations in original).

As noted above, the Confrontation Clause of the Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. But this constitutional protection is not absolute. "[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds[.]" Buechting, 633 S.W.3d at 377 (quoting Crawford, 541 U.S. at 62); see also United States v. Jackson, 706 F.3d 264, 269 (4th Cir. 2013) ("While the Confrontation Clause is fundamental to our conception of a fair and just system of criminal adjudication, so also is the vigorous and candid participation of relevant witnesses."). Applying this exception, McLaughlin held that "[t]he Constitution does not guarantee an accused person against the legitimate consequences of his [or her] own wrongful acts." McLaughlin, 265 S.W.3d at 271 (internal quotation omitted). In McLaughlin, the State charged the defendant with first-degree murder of his ex-girlfriend, who had filed multiple

---

1. A statement made by a witness that is not otherwise admissible is admissible in evidence in a criminal proceeding as substantive evidence to prove the truth of the matter asserted if, after a hearing, the court finds, by a preponderance of the evidence, that:
(1) The defendant engaged in or acquiesced to wrongdoing with the purpose of causing the unavailability of the witness;
(2) The wrongdoing in which the defendant engaged or acquiesced has caused or substantially contributed to cause the unavailability of the witness;
(3) The state exercised due diligence to secure by subpoena or other means the attendance of the witness at the proceeding, or the witness is unavailable because the defendant caused or acquiesced in the death of the witness; and
(4) The witness fails to appear at the proceeding.
2. In a jury trial, the hearing and finding to determine the admissibility of the statement shall be held and found outside the presence of the jury and before the case is submitted to the jury.

Section 491.016 (Cum. Supp. 2021). We apply the pre-codification case-law doctrine in our discussion while remaining cognizant of the new statutory guidance. See Buechting, 633 S.W.3d at 371 n.4.

protective orders against him. Id. The Supreme Court found the victim's hearsay statements against the defendant admissible under the forfeiture-by-wrongdoing exception because there was sufficient evidence that defendant had killed victim to prevent her from testifying against him. Id. at 272–73. Importantly, there must be a determination that the defendant had the requisite intent, as "[t]he forfeiture by wrongdoing doctrine applies 'only when the defendant engage[s] in conduct *designed* to prevent the witness from testifying." State v. Ivey, 427 S.W.3d 854, 862 (Mo. App. W.D. 2014) (quoting Giles v. California, 554 U.S. 353, 359 (2008)) (emphasis in original).

In order for the forfeiture-by-wrongdoing exception to apply to the admission of A.H.'s Hearsay Statements, the State was required to show by a preponderance of the evidence that Hartwein procured A.H.'s unavailability for trial with the intent to prevent A.H. from testifying. See Davis, 547 U.S. at 833 (internal citation omitted) (noting "federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard");[6] see also McLaughlin, 265 S.W.3d at 271–72; Buechting, 633 S.W.3d at 377–78 (internal citations omitted).

Hartwein first suggests the trial court failed to apply the proper intent test when ruling to admit the Hearsay Statements following the motion hearing. We disagree. The parties' handwritten order signed by the trial court did not specify its findings as to Hartwein's intent. But the trial court is not required to make written findings of fact in issuing its admissibility ruling and we presume the trial court knows and correctly applies the law. See Riley v. Headland, 311 S.W.3d 891, 894 (Mo. App. S.D. 2010) (internal quotation omitted) ("[T]rial judges are presumed to know the law and to apply it in making their decisions"). We are

---

[6] Section 491.016 has codified the preponderance-of-the-evidence standard for forfeiture by wrongdoing.

36

persuaded from the record of the motion hearing that the trial court applied the correct legal standard.

Hartwein strongly argues the absence of *any* evidence that supports a finding that Hartwein caused A.H.'s unavailability in order to keep A.H. from testifying against her. This argument fails because the record contains sufficient circumstantial evidence to the contrary. See Lehman, 617 S.W.3d at 847 (internal citation omitted) (noting the sufficiency of circumstantial evidence to sustain conviction); Younger, 640 S.W.3d at 171 (quoting Williams, 405 S.W.3d at 599) (noting "[i]ntent can be established by circumstantial evidence or inferred from surrounding facts"); Licata, 501 S.W.3d at 452 (quoting Hunt, 451 S.W.3d at 257) (noting intent "is typically inferred from circumstantial evidence"). The record shows the State subpoenaed A.H. to testify at trial by serving Father, who had legal custody, although A.H. officially remained a missing person. As a minor whom the police considered a missing person and who in the past had been living with Hartwein when missing from Father's custody, the inference that Hartwein procured A.H.'s unavailability is reasonable.

At the motion hearing, the State adduced testimony from three police officers and A.H.'s friend's mother regarding Hartwein's past interactions with police involving custody over A.H. Specifically, during the February 2017 incident, Hartwein arrived at the school lobby stating her intent to retrieve A.H. in violation of the court order, then followed A.H.'s bus route to Father's neighborhood. A.H. told officers he was supposed to go with her instead of going to Father's house that day, and further told officers that he and Hartwein generally made plans for her to pick him up after school and that he had been living with her since October or November of the previous year. Testimony about calls for a runaway juvenile in 2019 showed A.H. was "home again, gone again, home again, gone again," as Officer Valenti described in opining that

37

Hartwein had something to do with A.H.'s absence in the criminal proceedings. When A.H. was supposed to be with Father pursuant to court order, Hartwein went looking for him at his friend's house. Sergeant Weeke observed that Hartwein had coached A.H. on what to say about why he did not want to live with Father when they spoke in 2017, basing his assessment on A.H. using identical phrasing to Hartwein and being unable to personally describe the allegedly hazardous lab in Father's basement. Officer Valenti was suspicious about the contents of a written statement Hartwein brought to officers on A.H.'s behalf, instead of bringing A.H. to speak with the officers. The written statement had portions whited out and contained terms like "traumatized" that only Hartwein had used. The last time Officer Valenti had been able to speak with A.H. was in 2019, and when he confronted A.H. about whether he was living with Hartwein, A.H. responded, "Find the evidence."

A reasonable fact-finder could infer from the record of the motion hearing that Hartwein was keeping A.H. in her custody and preventing him from testifying in her case with the requisite intent to prevent him from providing incriminating testimony against her. See Buechting, 633 S.W.3d 377–78 (citing McLaughlin, 265 S.W.3d at 271). The incriminating nature of the Hearsay Statements as to Hartwein's guilt on the charged offenses was readily apparent, and indeed the Hearsay Statements were used at trial to support conviction as discussed in Points One and Two. See id. While A.H. was sometimes uncooperative with police questioning, such as when telling Officer Valenti to "[f]ind the evidence" of him living with Hartwein when he was supposed to be living with Father, A.H. at other times displayed forthrightness. Given that A.H. admitted to living with Hartwein before, it was not merely speculative for the trial court to infer that Hartwein sought to keep A.H. from testifying that he was in her custody when he was supposed to be living with Father. See Lehman, 617 S.W.3d at

38

847 (citing Langdon, 110 S.W.3d at 811–12). The State also presented circumstantial evidence tending to show Hartwein's attempts to control A.H.'s statements to police, including coaching him on how to describe his living conditions with Father and providing a statement on A.H.'s behalf that may have been edited or authored by Hartwein. We also note that Hartwein did not suggest an alternative reason for A.H.'s absence from the criminal proceedings. See Ivey, 427 S.W.3d at 863 (recognizing that "a witness's absence can be procured by intimidation and harassment no less effectively than by secreting away or murdering the witness" but doubting application of the forfeiture-by-wrongdoing exception where the child victim was declared unavailable because testifying in the personal presence of her abuser would cause psychological or emotional trauma, and ultimately ruling on other grounds).

The testimony concerning Hartwein's past conduct with respect to A.H.'s custody permitted a reasonable inference that Hartwein had physical custody of A.H. at the time of her trial and was keeping him from appearing and offering incriminating testimony. See Younger, 640 S.W.3d at 171 (quoting Thompson, 538 S.W.3d at 393) (noting "intent may be inferred from . . . defendant's conduct before the act, from the act itself, and from defendant's subsequent conduct."). Despite the absence of witness testimony that either Hartwein or A.H. affirmatively stated that Hartwein intended to keep A.H. from coming to court to testify, "direct evidence [of intent] is rarely available." Licata, 501 S.W.3d at 452 (quoting Hunt, 451 S.W.3d at 257). Rather, the State presented sufficient evidence regarding the surrounding circumstances of A.H.'s unavailability and Hartwein's involvement therein to show by a preponderance of the evidence that Hartwein had the intent to keep A.H. from testifying against her. See id.; see also Lehman, 617 S.W.3d at 847 (internal citation omitted).

39

Further, the State did not need to prove Hartwein's *exclusive* intent in causing A.H.'s

unavailability was to prevent him from providing incriminating testimony. Rather, the

forfeiture-by-wrongdoing exception applies even when a defendant may have multiple

motivations for making a witness unavailable. See, e.g., Jackson, 706 F.3d at 269. Jackson

summarized relevant state and federal jurisprudence on the non-exclusivity of intent under the

forfeiture-by-wrongdoing doctrine:

> For instance, the First Circuit has explicitly stated that "it is sufficient in this regard to show that the evildoer was motivated in part by a desire to silence the witness; the intent to deprive the prosecution of testimony need not be the actor's sole motivation." United States v. Houlihan, 92 F.3d 1271, 1279 (1st Cir. 1996) (emphasis in original). And in a post-Crawford decision, the D.C. Circuit concluded that imposing an exclusive-intent requirement would have the "perverse consequence" of "allowing criminals to murder informants and thereby prevent admission of the informants' statements—just so long as the criminal could show that the intent was retaliation (which the criminal almost always could do)." United States v. Martinez, 476 F.3d 961, 966 (D.C. Cir. 2007); see also, e.g., People v. Banos, 178 Cal. App. 4th 483, 100 Cal.Rptr.3d 476, 493 (2009) ("It strikes us as illogical and inconsistent with the equitable nature of the [forfeiture-by-wrongdoing exception] to hold that a defendant who otherwise would forfeit confrontation rights by his wrongdoing (intent to dissuade a witness) suddenly regains those confrontation rights if he can demonstrate another evil motive for his conduct."), cert. denied, —— U.S. ——, 130 S.Ct. 3289, 176 L.Ed.2d 1195 (2010).

Id. Consequently, while Hartwein may have expressed or had other justifications for preventing

A.H. from appearing to testify—such as to protect A.H. or to keep him away from Father—such

other motivation does not preclude a finding that Hartwein also intended to prevent A.H. from

offering testimony that would incriminate her on the charged offenses. See id.

Likewise, we are not persuaded that the forfeiture-by-wrongdoing exception cannot or

should not be applied in cases involving criminal charges of interference with custody. Although

the exception is most commonly applied in murder cases, the newly enacted Section 491.016

simply states the exception applies in "criminal proceedings" and does not otherwise limit its

application. Our analysis comports with similar interpretations of the forfeiture-by-wrongdoing

40

exception in other states. See also, e.g., State v. Shaka, 927 N.W.2d 762, 669–70 (Minn. App. 2019) (holding in a Minnesota case involving the violation of a domestic abuse no-contact order that the forfeiture-by-wrongdoing exception applied because circumstantial evidence supported finding that the defendant's calls to his family members caused the wife not to appear to testify at trial); Brittain v. State, 766 S.E.2d 106, 115 (Ga. App. 2014) (holding in a Georgia assault and kidnapping case that forfeiture-by-wrongdoing exception applied to the admission of the victim's recorded testimony where the victim—a single mother to three children—had been missing for years and other witnesses testified to foul play involved in her disappearance).

Given the circumstantial evidence within the evidentiary record, we find the trial court did not err in admitting the Hearsay Testimony under the exception for forfeiture by wrongdoing. See Buechting, 633 S.W.3d at 376. Because the circuit court committed no erroring admitting the Hearsay Statements into evidence, we need not evaluate whether the alleged error resulted in manifest injustice. See Shigemura, 552 S.W.3d at 744 (internal quotation omitted). Point Three is denied.

## Conclusion

The judgment of the trial court is affirmed in part and reversed and remanded in part. We reverse the judgment of conviction on Count II and enter judgment of conviction on the lesser-included offense of attempted interference with custody. We affirm the judgment in other respects. We remand to the trial court for sentencing consistent with this opinion.

KURT S. ODENWALD, Presiding Judge

Kelly C. Broniec, J., concurs.
John P. Torbitzky, J., concurs.

41